**Kenneth Joe PRESSWOOD, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11–02–00316–CR.**

Court of Appeals of Texas, Eastland.

Dec. 11, 2003.

Jeanie R. Fuller, Rees & Rees, Colorado City, Thomas L. Rees, Jr., Rees & Rees, Sweetwater, for appellant.

Mark Edwards, Dist. Atty., Ann Reed, Assistant, Sweetwater, for appellee.

Panel consists of: ARNOT, C.J., and WRIGHT, J., and McCALL, J.

Opinion

JIM R. WRIGHT, Justice.

The jury convicted Kenneth Joe Presswood of recklessly, by omission, causing serious bodily injury to an elderly person, a second degree felony. The trial court

assessed appellant's punishment at confinement for 8 years and a $10,000 fine. The trial court suspended the confinement portion of the sentence and placed appellant on community supervision for 8 years. We affirm.

Appellant brings four points of error on appeal. First, he asserts that the trial court committed harmful error when it excluded expert testimony. Appellant also contends that there is a fatal variance between the indictment, the jury charge, and the evidence at trial. Appellant further alleges that the indictment failed to give notice of the manner and means of the omission giving rise to the offense and, therefore, appellant's conviction is void. Finally, appellant asserts that the evidence is legally and factually insufficient to support the verdict.

Appellant, a 57–year–old man, lived with his mother, Mrs. Presswood who was the 92–year–old victim in this case. Appellant had lived with his mother for 56 years and 9 days prior to her death on October 27, 2001. He had provided care for his mother from time to time when she became ill. He provided such care in March 1995 when Mrs. Presswood broke her hip and required surgery. Doctors also determined that Mrs. Presswood's preexisting circulatory problems had become more serious. In April 1996, Mrs. Presswood saw a doctor for a physical examination. The examination at that time showed a blood supply blockage, and the doctor recommended surgery. Mrs. Presswood had had what she considered to be negative experiences between her family and the medical profession, and she declined to have the surgery. In 1997, Mrs. Presswood began to get weaker, and she started to use a walker. As Mrs. Presswood became weaker, appellant began giving her nutritional supplements to make her stronger, and she showed some improvement in 1998–1999. Appellant continued to give his mother nutritional supplements from 1998 into 2001. In May 1999, Mrs. Presswood could not get out of bed, but she could sit up on the side of the bed to eat. Appellant bathed, dressed, changed sheets, and cooked for Mrs. Presswood. Appellant cooked four different types of menus for Mrs. Presswood, all but one of which lasted for a week at a time and one of which was repeated every other week. However, he did not state how much his mother ate at each meal.

In August 2001, appellant began to notice black marks that were indicative of bedsores. The marks continued to grow; and, in the first week of September 2001, they turned into open sores. The sores were on Mrs. Presswood's knees, buttocks, hip, shoulder, and ankle. Appellant treated the bedsores at home, but they continued to get worse. Appellant testified that he would make bandages out of paper towels, put Betadine in the sores, and put a diaper rash ointment at the edge of the sores. Appellant testified that it was time consuming and difficult to get his mother to eat and to keep her clean. The open bedsores would become contaminated with urine and fecal material.

By September 11, 2001, the bedsores were worse, and appellant began trying to find a health care facility that would use nutrition as a treatment rather than regular pharmaceuticals. Appellant testified that he took that course of action because he wanted to continue "with the nutritional regimen that [he] had her on." Although he had been giving Mrs. Presswood nutritional supplements since 1998, appellant was looking for herbs or additional nutritional aid to treat his mother's sores. Appellant was given the name of Dr. Steven Wayne Hines, a naturopathic doctor, who could be reached through a health food store in Abilene. Dr. Hines gave appellant

a nutrition regimen over the telephone, and appellant began to administer some of this treatment in mid-September 2001. Appellant testified that he was too busy taking care of Mrs. Presswood to go purchase the rest of the nutritional items recommended by Dr. Hines and that he just used what he already had. Although he was using some of the products recommended by Dr. Hines, appellant testified that "it was just beginning to get more than [he] could do physically and keep up with it." Mrs. Presswood did not get any better.

Sometime after September 13, 2001, appellant began to call individual doctors. Appellant testified that he did not want to take Mrs. Presswood to a doctor but that he just wanted to talk to one. On September 19, 2001, he called to make an appointment with Family Medical Associates for the following day. However, appellant called and cancelled the appointment "because it was still too much to take care of [his] mother and leave like that and [he] just didn't want to do it." Then, on September 21, 2001, appellant called Mitchell County Ambulance Service and asked them about taking Mrs. Presswood to a hospital in Abilene. Appellant was told that, unless a local doctor transferred a patient to Abilene, the patient would have to pay the bill. Appellant did not make an appointment.

On Saturday, September 22, 2001, at about 12:30 p.m., appellant called "Rolling Plains Health Care Facility"; however, they had closed at noon. That evening, appellant tried to call a doctor but was unsuccessful. Sunday evening, appellant was able to contact another doctor. Appellant testified that he "was still trying to find doctors that would use nutrition." Appellant was told that Dr. Jerome Smola used nutrition in his treatment programs. Appellant contacted Dr. Smola on Sunday

and was instructed to make an appointment through his office on Monday. Dr. Smola's office scheduled an appointment at the hospital, and an ambulance took Mrs. Presswood there on September 24, 2001. She was admitted to the hospital in Sweetwater and then transferred to SCCI Hospital in San Angelo. Upon admission to the hospital in Sweetwater, Mrs. Presswood had 11 open bedsores. A bedsore on her hip was infected to the bone, and the infection had spread from her hip to the adjacent bone. Appellant testified that the bedsores continued to get worse while his mother was in the hospital. Mrs. Presswood died on October 27, 2001.

Toni Everett, one of the registered nurses who performed the initial evaluation at the hospital, testified that Mrs. Presswood had cool extremities, below normal temperature, and poor skin turgor, all of which was evidence of dehydration. Carol Higdon, another nurse who treated Mrs. Presswood in the emergency room, testified that she looked malnourished and dehydrated. Higdon further testified that poor nutritional status, inability to move, and being left in one position for a long period of time could lead to the development of bedsores. She also testified that Mrs. Presswood had no "pedal pulses" in the foot, an indication that she had poor circulation that made her more susceptible to bedsores. Mrs. Presswood showed signs of methicillin-resistant staphylococcus aureus. "MRSA and MRSE bacteria" were found in the wounds. Both types of bacteria were antibiotic resistant and were very difficult to treat.

Mrs. Presswood's treating physician consulted Dr. Fred Kassis at the hospital. Dr. Kassis testified that the three big issues of concern for Mrs. Presswood were malnutrition, dehydration, and dementia. Mrs. Presswood's albumin level, the molecule in the blood that is used to determine

malnutrition, was at 1.7 when she came to the hospital. A person with an albumin level of 2.1 is considered to be severely malnourished. Appellant testified that Mrs. Presswood had not eaten anything except honey and nutritional supplements for six days before entering the hospital. Dr. Kassis testified that it would take "a while" for a person's albumin level to get as low as Mrs. Presswood's was when she was first admitted to the hospital. Mrs. Presswood's malnourished cells could not fight off the infection in her body. Dr. Kassis testified that the three major causes of bedsores were pressure, malnutrition, and circulation. It would take about six to eight weeks for infection to reach the bone, as it had on the bedsore on the hip of Mrs. Presswood. Dr. Kassis testified that many people over 80 years of age suffer from hardening of the arteries. However, he also testified that, while he had treated many patients with hardening of the arteries and bedsores, he had very rarely seen bedsores as serious as those on Mrs. Presswood. Dr. Kassis testified that the level of care Mrs. Presswood received prior to her last hospital admission was very poor and that her condition met the legal definition of serious bodily injury.

■ We will first discuss appellant's sufficiency claims. As related to his case, a person commits the offense of injury to an elderly individual if: (1) a person with the duty to act, (2) intentionally, knowingly, or recklessly, (3) by omission, (4) causes serious bodily injury, (5) to an elderly individual. TEX. PENAL CODE ANN. § 22.04(a) (Vernon 2003). An elderly individual is a person 65 years or older. TEX. PENAL CODE ANN. § 22.04(c)(2) (Vernon 2003). An omission constitutes an offense when a person has the duty to act, when there is a legal or statutory duty present, or when the actor has assumed care of the elderly individual. TEX. PE-NAL CODE ANN. § 22.04(b) (Vernon 2003). A person has assumed care of an individual when, by act, words, or course of conduct, he has acted in such a manner that a reasonable person could conclude that the actor has accepted responsibility for the medical care of an elderly individual. TEX. PENAL CODE ANN. § 22.04(d) (Vernon 2003). There are religious exceptions to this offense that do not apply in this case. TEX. PENAL CODE ANN. § 22.04(k)(2) (Vernon 2003).

In order to determine if the evidence is legally sufficient, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Jackson v. State,* 17 S.W.3d 664 (Tex.Cr. App.2000). In order to determine if the evidence is factually sufficient, we must review all of the evidence in a neutral light and determine whether the evidence supporting guilt is so weak as to render the conviction clearly wrong and manifestly unjust or whether the evidence supporting guilt, although adequate when taken alone, is so greatly outweighed by the overwhelming weight of contrary evidence as to render the conviction clearly wrong and manifestly unjust. *Vasquez v. State,* 67 S.W.3d 229, 236 (Tex.Cr.App.2002); *Goodman v. State,* 66 S.W.3d 283 (Tex.Cr.App. 2001); *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Cr.App.2000); *Cain v. State,* 958 S.W.2d 404 (Tex.Cr.App.1997); *Clewis v. State,* 922 S.W.2d 126 (Tex.Cr.App.1996).

Here, the evidence established that Mrs. Presswood was an elderly individual and that appellant had assumed her care and, therefore, had a duty to act. The evidence further showed that the care she received was not proper. Dr. Kassis testified that the treatment Mrs. Presswood received

was poor and that the severity of the bedsores could have been prevented. Appellant argues that there is no evidence to support a finding that his mother did not receive proper medical attention for a year or more. We disagree. The evidence shows that Mrs. Presswood had been bedridden since May 1999 and that appellant did not seek medical attention for her. Appellant attempted to provide naturopathic care for his mother, but the evidence established that she was severely malnourished and dehydrated and that this condition exacerbated her bedsores. Appellant admitted on numerous occasions that he did not obtain medical help for Mrs. Presswood because he wanted to continue his nutritional program. On cross-examination of appellant by the State:

Q: Why didn't you call in an ambulance on September 11th?

A: Because I was trying to use nutritional supplements to help.

\* \* \*

Q: Why didn't you call for an ambulance on the 19th to get medical care?

A: Because I wanted to use the nutritional supplements.

We point out that, although appellant contacted many television, radio, and local ministries for prayer, neither he nor Mrs. Presswood had any religious objections to medical doctors or to the medical profession. He was merely unhappy with some of the treatment they gave. The evidence presented was both legally and factually sufficient to support the jury's verdict. We overrule appellant's third and fourth points of error.

 In appellant's second point of error, he contends that there is a fatal variance between the indictment and the evidence at trial and that the indictment did not provide notice of the manner and means of the omission with which he was charged.

Appellant's indictment read in relevant part:

KENNETH JOE PRESSWOOD … did then and there *intentionally and knowingly, by omission,* cause serious bodily injury to Katherine Presswood, an individual 65 years of age or older, by allowing Katherine Presswood to remain bedridden for over one year without proper medical attention.

KENNETH JOE PRESSWOOD did then and there *recklessly, by omission,* cause serious bodily injury to Katherine Presswood, an individual 65 years of age or older, by allowing Katherine Presswood to remain bedridden for over one year without proper medical attention. (Emphasis added)

 A variance between the indictment and the evidence at trial is fatal if it materially affects the defendant's substantial rights. *Gollihar v. State,* 46 S.W.3d 243 (Tex.Cr.App.2001). A variance occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial. A variance occurs when the State has proven the defendant guilty of a crime, but has proven its commission in a manner that varies from the allegations in the charging instrument. *Gollihar v. State, supra.* To determine if it is a material variance, we ask: Does the indictment, as written, inform the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial and does prosecution under the deficiently-drafted indictment subject the defendant to the risk of being prosecuted later for the same crime? *Gollihar v. State, supra* at 257 (citing *United States v. Sprick,* 233 F.3d 845 (5th Cir.2000)).

Based on the evidence in this case, there is not a variance between the indictment and the evidence at trial. The State established that the victim was bedridden without medical attention for over one year.

The indictment notified appellant of the charges against him, and he was able to present a proper defense. Appellant is not in danger of being tried twice for the same offense in this case. Appellant's second point of error is overruled.

■■ Finally, we will discuss the trial court's decision to exclude the expert testimony of Dr. Hines. The trial court's decision to admit scientific evidence is reviewed under an abuse-of-discretion standard. *Griffith v. State*, 983 S.W.2d 282, 287 (Tex.Cr.App.1998), *cert. den'd*, 528 U.S. 826, 120 S.Ct. 77, 145 L.Ed.2d 65 (1999). An appellate court will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Burden v. State*, 55 S.W.3d 608, 615 (Tex.Cr.App.2001).

■ The trial court's role is to act as a "gatekeeper" by admitting only expert testimony that will help the trier of fact understand the evidence or to determine a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595–99, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). A proponent of expert evidence must show, by clear and convincing evidence, that the evidence proffered was sufficiently relevant and reliable to assist the jury in reaching accurate results. TEX.R.EVID. 702; *Kelly v. State*, 824 S.W.2d 568 (Tex. Cr.App.1992). Relevant testimony is testimony that ties scientific principles to the facts of the case. *Jordan v. State*, 928 S.W.2d 550 (Tex.Cr.App.1996). Reliable testimony derived from scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied. *Kelly v. State*, *supra* at 573. Reliability of testimony based on training and experience is subject to less stringent standards. In such cases, the questions to answer are: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies upon and utilizes the principles involved in that field. *Weathered v. State*, 15 S.W.3d 540, 542 (Tex.Cr.App.2000)(citing *Nenno v. State*, 970 S.W.2d 549, 561 (Tex.Cr.App.1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex.Cr.App. 1999)).

Dr. Steven Wayne Hines, N.D. testified that he was a naturopathic doctor and had clinics in Acuna, Mexico; San Angelo; Lubbock; Abilene; and Durango, Colorado. He received his doctorate in naturopathic medicine from the Herbal Healer Academy of Naturopathic Medicine in Mountain View, Arkansas. Before receiving his degree in naturopathy, Dr. Hines had practiced naturopathic medicine for six years under several different medical doctors. Dr. Hines testified that, because Texas does not have a State Board of Naturopathy, he could not "put substances into the veins of [his] patients" in Texas. Dr. Hines stated that he has about 600 patients. He also explained the differences between naturopathic medicine and "mainstream or allopathic medicine." It is the belief of naturopaths that diseases are a result of toxic exposure to chemicals and solvents as well as nutritional deficiencies and gastric disturbances. Naturopaths use natural elements to detoxify the body and control the patient's diet. Dr. Hines testified that he had lectured on the subject of naturopathy in various settings and had also written several articles and books. Specifically, he had lectured on herbal organic medicine. Dr. Hines testified that there were hundreds of studies done all over the United States pertaining to naturopathy. While he could discuss the nature and some results of one specific test,

Dr. Hines was unable to testify as to where the study took place, where the findings were published, as well as the name of the study. Dr. Hines could not identify any of the names of the tests conducted in relation to naturopathic medicine or where they were conducted, and he only gave general results of the tests. *See Weatherred v. State, supra* at 543. He recalled one journal article relating to naturopathy that was published in the New England Journal of Medicine but did not know when it was published or the name of the study. Also, a copy of the journal was not entered into evidence. Dr. Hines testified that he was able to see beneficial results from naturopathic treatment in his patients. He further testified that naturopathic medicine could be chosen as a form of treatment because of religious convictions or bad past experiences with conventional medicine.

Dr. Hines testified that he never saw Mrs. Presswood, that he only talked to appellant on the phone about her care, and that he recommended some nutritional supplements. Dr. Hines also talked to Mrs. Presswood's treating physician at the hospital about some of his recommendations for her treatment. Dr. Hines told the jury about the benefits of each nutritional supplement that was on the list of supplements that appellant gave to his mother. However, he did not give details as to the specific effects the 11 nutritional supplements had on Mrs. Presswood, and he stressed that he never saw her. He reviewed the medical records but did not know how the supplements affected Mrs. Presswood. Dr. Hines also testified that appellant indicated to him that he did not want his mother to go to the hospital at all costs and that, finally, appellant took his mother to the hospital because he was unable to care for her anymore.

The trial court did not abuse its discretion when it excluded Dr. Hines's testimony. Appellant failed to show that Dr. Hines's testimony was either reliable or relevant. *See Daubert v. Merrell Dow Pharmaceuticals, Inc., supra; Weatherred v. State, supra; Nenno v. State, supra; Jordan v. State, supra; Kelly v. State, supra.* Appellant's first point of error is overruled.

We affirm the judgment of the trial court.