**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 99-50941
Consolidated With
No. 99-50959

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL ARLAN SPRICK,

Defendant-Appellant.

- - - - - - - - - -
Appeals from the United States District Court
for the Western District of Texas

- - - - - - - - - -
November 14, 2000

Before KING, Chief Judge, WIENER, Circuit Judge, and LYNN[*], District Judge.

WIENER, Circuit Judge:

In this prosecution for bank fraud, mail fraud, and money laundering, Defendant-Appellant Michael Arlan Sprick appeals the jury's verdict of guilty on one of six bank fraud counts, six of six mail fraud counts, and seven money laundering counts — one related to the bank fraud count of conviction and six related to the mail fraud counts of conviction. He contends that the evidence was legally insufficient to sustain his convictions for the one count of bank fraud under 18 U.S.C. § 1344(2) and one related count of money laundering under 18 U.S.C. § 1956, as well as the six

---

[*] Barbara M.G. Lynn, District Judge of the Northern District of Texas, sitting by designation.

counts of mail fraud under 18 U.S.C. § 1341 and six related counts of money laundering. He also asserts that the district court erred in (1) admitting evidence of a failed e-mail transmission, in violation of Federal Rule of Evidence 403, and (2) adopting the probation department's finding that the amount of money laundered exceeded $1,000,000.

We conclude that the district court did not abuse its discretion in admitting evidence of the failed e-mail transmission and did not commit clear error in adopting the probation department's finding that the amount laundered exceeded $1,000,000. Viewing all the evidence in the light most favorable to the jury's verdict, as we must, we find that the evidence was sufficient to support that verdict as to all charges against Sprick except the one count of bank fraud and the one count of money laundering related to the bank fraud. Therefore, we affirm in part and reverse in part Sprick's convictions based on the jury's verdict, and we affirm the rulings of the district court contested by Sprick.

## I.

### *Facts and Proceedings*

In the mid-1980s, Sprick went into business as a financial advisor. His principal clients were three elderly widows: Mrs. Maurita Johnson, who entrusted him with $1,090,000; Mrs. Corrine Parker, who entrusted him with $800,000; and Mrs. Annie Hallford, who entrusted him with $70,000. Each entrusted funds to Sprick in the expectation that he would manage them for her benefit. To each

2

victim it was a given that Sprick would not spend her funds to support his lavish lifestyle or otherwise for his personal benefit. Yet Sprick did just that, spending his investors' money on, among other things, a luxurious personal residence in Odessa, Texas.

At the time of trial, Mrs. Johnson was an 83 year-old widow who had suffered for many years from macular degeneration, an eye disease that causes progressive blindness. Because of her advancing age and deteriorating eyesight, Mrs. Johnson's accountant counseled her to engage a financial advisor to manage her money. As Mrs. Johnson was a long-time friend of Sprick's grandmother, he was eventually able to persuade her to entrust her life savings of roughly $1,000,000 to him. She later entrusted another $90,000 to him. According to Mrs. Johnson, she understood that Sprick was to manage her money for her benefit at all times; in fact, she instructed Sprick to invest only in "blue chip stocks."

Mrs. Johnson's eyesight continued to deteriorate, so she signed a power of attorney that gave Sprick authority to deal directly with her funds. She understood that he would do so only for the limited purposes of handling her investments, paying her bills, and eventually taking care of her funeral and burial. Mrs. Johnson did not read the power of attorney, even though she had the ability to do so, relying instead on Sprick's description of its contents. Sprick also informed Mrs. Johnson that she would not have to pay him any commissions out of her money. Don Copeland, a Special Agent with the Internal Revenue Service ("IRS") testified

that nothing in the power of attorney gave Sprick the right to spend Mrs. Johnson's money on himself.

Sprick placed Mrs. Johnson's funds in an account with Fidelity Brokerage ("Fidelity") and set up an annuity contract for her with USG Annuity & Life Company ("USG"). Sprick listed the address for the USG contract as P.O. Box 14095, Odessa, Texas, which he had obtained in one of his "doing business as" names, "Southwest Senior Services." He also designated that entity as the beneficiary of the USG contract. In opening the annuity account with USG, Sprick listed his own mailing address as P.O. Box 14044, Odessa. Because the numbers of the two post office boxes were different, no "red flags" were raised in the eyes of USG. Two deposits totaling $198,000 were made into the USG account in the spring of 1993. In 1998, two withdrawal requests were purportedly made by Mrs. Johnson, and two checks payable to her — one for $49,000 and the other for $162,000 — were mailed by USG to the Southwest Senior Services address, P.O. Box 14095, in Odessa.

Mrs. Parker was 92 years old at the time of trial and testified by way of a video deposition. She signed a power of attorney naming Sprick as her agent, understanding that he would spend her money for her benefit only and not for his. Over the course of their business relationship, Sprick mailed a number of account statements to Mrs. Parker, reflecting that she had invested more than $1,000,000 with him, $145,000 of it with Fidelity Brokerage. He informed Mrs. Parker that his services would cost

4

her nothing and that all commissions would come from the brokers. In all, she invested $800,000 with Sprick.

Mrs. Parker's nephew, James Standefer, became suspicious when Sprick refused to discuss Mrs. Parker's financial condition and when Standefer learned that Sprick had invested some of Mrs. Parker's money in a 10-year, low interest annuity that would not become payable until she was 98 years old and that charged a substantial penalty for early withdrawals. As a result, Standefer had Mrs. Parker withdraw the power of attorney that she had given to Sprick. When Standefer threatened to report Sprick's activities to the District Attorney, Sprick replied "I speculated and it didn't work out and I may do time for this . . ."

After Standefer subsequently demanded the return of his aunt's remaining balance of $160,000, Sprick wrote a check from his business account with Bluebonnet Savings Bank ("Bluebonnet").[1] This check initially bounced. Sprick then made an early withdrawal of funds from Mrs. Johnson's USG annuity account, incurring a substantial penalty. He did not inform Mrs. Johnson that he was withdrawing cash from this annuity, instead signing her name without her knowledge. After Sprick deposited $162,000 of Mrs. Johnson's proceeds into his own account in Bluebonnet, that bank called Mrs. Parker to inform her that the previously-bounced check would clear. IRS Agent Copeland testified that Sprick's financial records made it clear that he sent numerous financial statements

---

[1] Bluebonnet was eventually acquired by NationsBank, but we refer to Sprick's bank as Bluebonnet throughout this opinion to avoid confusion.

containing false investment information regarding the Fidelity Brokerage account to Mrs. Johnson and Mrs. Parker.

Mrs. Annie Hallford is the grandmother of Sprick's ex-wife. Mrs. Hallford invested $38,000 with Sprick in 1986 (while he was still married to her granddaughter) but did not grant him a power of attorney. She understood that Sprick would invest her money for her benefit and would not spend it on himself. Mrs. Hallford did not give Sprick permission to spend $20,000 of her money in 1990 or $12,000 in 1996, as he did. These amounts represent two annuities that Sprick had purchased in Mrs. Hallford's name with Guarantee Reassurance Company ("Guarantee"). In 1990, a check for $20,000 was mailed from Guarantee to P.O. Box 14044 in Odessa, an address registered to Sprick. In 1996, a request to withdraw $12,000 from Mrs. Hallford's annuity contract was sent to Guarantee in Jacksonville, Florida via Federal Express from another of Sprick's business names, Southwest Financial Services, listing its address as 23 Amethyst Cove, Odessa, Texas, which was Sprick's home address at the time. The annuity contract nowhere specified that Sprick could receive checks on behalf of Mrs. Hallford. When the check was received, both Mrs. Hallford and Sprick endorsed it. Following Sprick's divorce from her granddaughter, Mrs. Hallford requested the return of her funds and received a check from Sprick, doing business as Southwest Senior Services, for $48,906.58.

The evidence reflects that Sprick never opened investment accounts in the names of either Mrs. Johnson or Mrs. Parker. (A document that appeared to be a contract between Mrs. Johnson and

6

Fidelity was found during the search of Sprick's home, but it was determined to be a sham). On the other hand, Sprick did have an account with Fidelity in the name of Southwest Financial Services. Mrs. Parker's three checks made out to Fidelity — one for $62,000, another for $50,000, and a third for $30,000 — were deposited into Sprick's account, on which no interest of either Mrs. Parker or Mrs. Johnson was reflected.

Sprick opened a bank account at Bluebonnet in 1993 in the name of "Southwest Senior Services" by depositing a $500 check from his Southwest Financial Services account at Fidelity. He then deposited into his Bluebonnet account the proceeds of a $99,000 certificate of deposit ("C.D.") belonging to Mrs. Johnson, as well as a $1,000 check belonging to her. The funds in this account were used by Sprick to pay his own debts and to make investments in his own name. For example, in the spring of 1993 Sprick took more than $491,000 from Mrs. Johnson's C.D.s and $25,000 of her money that he had run through his Bluebonnet account and deposited all of it into his own Fidelity account. Later that year, he transferred $52,000 of these funds to his personal Bluebonnet account and, on the same day, wrote a $51,830.49 check from this account to pay for lots at 23 Amethyst Cove, where he would subsequently build his house. In May, 1994, Sprick wrote a check for $144,073 of Mrs. Johnson's money — run through his Fidelity account and into his Bluebonnet account — to make a down payment on his house. Sprick also withdrew $49,000 from an annuity in Mrs. Johnson's name and

deposited that money into his Bluebonnet account, using it to refund $48,906.58 to Mrs. Hallford.

The government was able to trace other deposits of funds belonging to these three women directly to Sprick's accounts and from there to expenditures that he made for himself. IRS Agent Copeland testified that, based on the income reported on Sprick's tax returns and other financial records from 1993-1997, he could not have afforded his new house, new furniture, expensive trips, or personal investments, such as his purchase of a business corporation called the Eastland Corporation, without spending funds of these three victims.

Sprick's accountant testified that Sprick had been evasive when discussing his ability to afford a $300,000 house in 1994. In preparing Sprick's 1994 tax return, his accountant noticed that Sprick's expenses greatly exceeded his income, and when the accountant questioned this, Sprick explained that he "did a lot more playing than working" that year.

During a search of Sprick's home, the contents of his computer were examined and a failed e-mail transmission was discovered. That e-mail was addressed to a radio personality known as "Delilah," but it was returned as undeliverable because the wrong e-mail destination had been used. Over defense counsel's objection grounded in Federal Rule of Evidence 403, the failed e-mail was admitted into evidence. Its message was:

> . . .I was successful in business earning in excess of
> $200K per year, but that never seemed good enough for
> her. . . . I built one of the biggest houses in Odessa
> for her.   She wanted for nothing in material

8

matters. . . . I am in the financial services industry and deal with large amounts of money. I misappropriated, (or as another listener of your show mentioned the same earlier, and you straightened him out to admit stole), a large amount of money. Nobody was hurt because of their resources, but that does not excuse, and I am not trying to justify my actions, what and why I did what I did.

Delilah, today my attorney got a fax from the assistant attorney general of the United States. They are wanting me to admit what I did and face 3-4 years in a federal prison. I know I am guilty. I did a wrong thing because of the right reason . . . love.

This message was presented to the jury several times, including once when the entire e-mail was read aloud and again when only a portion, reproduced on a large illustration, was placed within the jury's view. The trial judge issued a cautionary instruction, stating in relevant part that "it is pretty clear that . . . this e-mail was written at a time when the Government was only considering . . . charges of bank fraud. It was not written at a time when the Government was considering a mail fraud charge."

The government contends that Sprick defrauded Mrs. Johnson of $926,000, Mrs. Parker of $142,000, and Mrs. Hallford of $32,000, conceding that Mrs. Parker and Mrs. Hallford were repaid by Sprick with money from Mrs. Johnson's account. IRS Agent Copeland testified that, because Sprick commingled his legitimate income with funds fraudulently obtained from these victims, an exact tracing of the funds was not possible.

A federal grand jury initially indicted Sprick on six counts of bank fraud and six related counts of money laundering, and subsequently indicted him on six counts of mail fraud and six related counts of money laundering. These charges were

9

consolidated on motion of the government. On the completion of a three-day trial, the jury convicted Sprick of only one count of bank fraud and one related charge of money laundering from among the six bank fraud and six related money laundering charges in the initial indictment; and convicted him of all six counts of mail fraud and all related money laundering charges in the subsequent indictment. The court sentenced Sprick to 136 months on the bank fraud conviction and 136 on the related money laundering conviction, to run concurrently. The court then sentenced Sprick to 60 months on the six mail fraud convictions, and 121 months on the six money laundering convictions related to mail fraud, to run concurrently with each other and with the bank fraud-related money laundering sentences. Sprick was also ordered to pay restitution in the amount of $926,000.

## II.

### *Analysis*

A. Standard of Review

In reviewing challenges to sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the jury's verdict, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2] We resolve all credibility determinations and reasonable inferences in favor of the jury's verdict.[3] We review evidentiary rulings,

---

[2] Jackson v. Virginia, 443 U.S. 307, 319 (1979).

[3] See United States v. Harvard, 103 F.2d 412, 421 (5th Cir. 1997).

10

including determinations under Federal Rule of Evidence 403, for abuse of discretion.[4] We examine "the district court's interpretation or application of the sentencing guidelines de novo and its findings . . . for clear error."[5]

B.  Bank Fraud

Sprick was convicted of obtaining "moneys . . ., under the custody or control of, a financial institution, by means of fraudulent pretense, representations, or promises."[6] He contends that the evidence presented at trial was not sufficient to support the jury's guilty verdict as to the charge of bank fraud, pursuant to 18 U.S.C. § 1344.[7] Sprick argues that, as a matter of law, the bank that he was charged with defrauding, Bluebonnet, could not have been civilly liable to anyone as a result of his conduct. He contends that under such circumstances the requirements of § 1344(2), as interpreted by this court, have not been met.[8] Under

---

[4] See United States v. De Leon, 170 F.3d 494, 497 (5th Cir. 1999).

[5] United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999).

[6] 18 U.S.C. § 1344(2) (2000).

[7] Section 1344 reads as follows:
Whoever knowingly executes, or attempts to execute, a scheme or artifice to defraud——
(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[8] We have interpreted § 1344(2) to require that the bank allegedly defrauded be exposed to civil liability as a result of the purportedly fraudulent acts. United States v. Briggs, 965

11

our precedent, for the prosecution to prove that the offense of bank fraud has been committed, it must show not only that the money or assets in the custody or control of a financial institution were obtained by means of fraud but also that doing so placed the financial institution at risk of civil liability.[9]

When Mrs. Parker's nephew threatened to report Sprick to the authorities, he wrote a $160,000 check to Mrs. Parker from his Bluebonnet account. When that check bounced, Sprick withdrew $162,000 from an annuity of Mrs. Johnson's, signing her name without her knowledge or permission and incurring a $6,750 early-withdrawal penalty in the process. At the time, Sprick had a power of attorney from Mrs. Johnson which explicitly covered the annuity in question, so he did have legal authority to sign her name and withdraw the money. He did not, though, have any right or authority to use those funds for his own purposes or benefit. Nevertheless, a few days after his check to Mrs. Parker had bounced, Sprick deposited the check from Mrs. Johnson's annuity account into his Bluebonnet account, endorsing it "Maurita Johnson" to whom it was payable. Bluebonnet then called Mrs. Parker and informed her that there were sufficient funds in Sprick's account

---

F.2d 10, 13 (5th Cir. 1992) ("Briggs III"). Other circuits are in accord: See e.g., United States v. Solomonson, 908 F.2d 358, 364 (8th Cir.1990); United States v. Walker, 871 F.2d 1298, 1305 n. 6 (6th Cir.1989); United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir.1987); see also United States v. Stavroulakis, 952 F.2d 686, 694 (2d Cir. 1992) (the scheme to defraud must expose the victim bank "to actual or potential loss"); United States v. Young, 952 F.2d 1252, 1257 (10th Cir.1991) (same).

[9] See Briggs III, 965 F.2d at 12-13.

to cover the check he had made payable to her, the one that had bounced.

The government contends that, under those facts, Bluebonnet could have been civilly liable to Mrs. Johnson for its failure to prevent Sprick from misusing her funds.  The government contends that a defense expert, whom the government questioned as a hostile witness, conceded that Bluebonnet could be civilly liable under the instant circumstances.  We disagree:  All that the expert conceded, after repeated questioning by the government, was that "anything's possible."

We cannot credit that testimony alone as probative of the government's argument that Bluebonnet could have been liable to Mrs. Johnson.  The government presented no other evidence and referred us to no legal authority demonstrating that a bank could be civilly liable by acting as Bluebonnet did in this instance.  We express no opinion on whether the bank would have civil liability in these circumstances; it is sufficient that the government provided no basis at trial or on appeal for concluding that the bank could have such liability.  It follows under our jurisprudence that Sprick could not be guilty of bank fraud under 18 U.S.C. § 1344.

C.  Mail Fraud

Sprick contends that there is insufficient evidence to support his convictions on the six counts of mail fraud charged in the second indictment under 18 U.S.C. § 1341.  To obtain a conviction of mail fraud charged under that section, the government must prove

13

that the defendant (1) knowingly (2) committed a scheme to defraud and (3) used the mails to execute or further that scheme.[10]

Sprick argues that there is no support in the record for his mail fraud conviction for the second indictment's Count One, the second sentence of which states that he "knowingly mailed . . . [a] check via the United States Postal Service" from Texas to Florida. The government acknowledges that this charge was supposed to include the words "request for a" immediately before the word "check," but insists that, if thus amended, there is ample support in the record for the conviction on the charge. The government further contends that the omission of "request for a" from that count was an immaterial "drafting error" which did not prejudice the defendant. We agree.

A variance between the wording of an indictment and the evidence presented at trial is fatal only if "it is material and prejudices . . . [the defendant's] substantial rights."[11] When reviewing such a variance, we must determine whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial,[12] and whether prosecution under the deficiently

---

[10] See United States v. Brown, 186 F.3d 661, 665 (5th Cir. 1999).

[11] United States v. Mikolajczyk, 137 F.3d 237, 243 (5th Cir. 1998).

[12] See United States v. Massey, 827 F.2d 995, 1003 (5th Cir. 1987).

14

drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime.[13]

The first sentence of Count One reads:

> On or about March 19, 1996, in the Western District of Texas and elsewhere, the Defendant, MICHAEL ARLAN SPRICK, knowingly executed and attempted to execute a scheme to defraud and obtain money by means of false and fraudulent pretenses, representations and promises by mailing <u>a request for a check</u> for $12,000 held in Annie Hallford's name at Guarantee Reassurance Corporation for deposit in DEFENDANT's own account. (Emphasis added).

In the next sentence, however, the words "request for a" were inadvertently omitted. The first sentence was sufficient to put defendant on notice of the charge against him, including the relevant date, the identity of the victim, and the details of the fraudulent conduct. A reasonable person, not to mention a reasonable defense attorney, would realize that the absence of "request for a" in the second sentence had to be a drafting error and would proceed accordingly.[14] Clerical or drafting errors such as this, which should cause no confusion, do not prejudice the defendant.[15] Inasmuch as the indictment accurately described the conduct for which Sprick was being prosecuted, and a reasonable

---

[13] <u>See</u> <u>United States v. Puig-Infante</u>, 19 F.3d 929, 936 (5th Cir. 1996).

[14] For instance, it should be noted that the jury recognized the error yet specifically commented in a handwritten note that they understood that "the 2 statements within the Count are one and the same though apparently [d]ifferent."

[15] <u>See</u> <u>United States v. Robles-Vertiz</u>, 155 F.3d 725, 729 (5th Cir. 1998) (upholding a conviction for alien smuggling despite an indictment which misnamed the alien that the defendant was charged with smuggling because it was a clerical error and the indictment sufficiently alerted the defendant to the transaction for which he was prosecuted).

15

person would have recognized the discrepancy as a mere drafting omission, we are convinced that the error was not material and that Sprick was not prejudiced thereby.  Neither could he be prosecuted a second time for this incident.

The record clearly supports the jury's verdict that Sprick committed the offense charged in Count One.  A request for a check was mailed from Sprick's then-current residence in Texas to Guarantee in Florida.  Guarantee's policy is to mail checks to requesters, and the record supports a conclusion that the requested check was mailed in this instance.  When Sprick received the check, he used the proceeds for his personal benefit.  The evidence is sufficient for a reasonable jury to conclude that Sprick committed mail fraud as charged in Count One.

Sprick also contests the sufficiency of the evidence to support his convictions for mail fraud on the second indictment's Counts Three, Five, and Seven, arguing that the record shows only that the checks at issue were "most likely" mailed.  This, Sprick insists, is insufficient to surpass the reasonable doubt standard.

To prove the offense of mail fraud, the government must show use of the mails in executing the scheme to defraud.  "Proof of mailing can be established by circumstantial evidence,"[16] but this "does not relieve the government of its burden to demonstrate to the jury the use of United States mails . . . beyond a reasonable

---

[16] Massey, 827 F.2d at 999.

doubt."[17]   When letters are regularly sent by private courier or similar methods of correspondence, "the inference that United States mails . . . were employed is cast into serious doubt."[18] When, however, it would be unusual for the transmittal in question to be made other than by mail, circumstantial evidence of the mailing is sufficient to support a mail fraud conviction.[19]

Evidence adduced at Sprick's trial shows that the regular business practice of Fidelity was to use the United States mails to transmit checks and other correspondence.   A representative of Fidelity testified that the checks from Fidelity to Sprick were "most likely" mailed, not otherwise delivered.   Other evidence presented at trial strongly supported the government's contention that the checks in question were mailed.  The check at issue lacked a branch prefix; the representative from Fidelity testified that checks without branch prefixes were typically mailed to Fidelity's central processing unit in Boston, Massachusetts; and the information on the deposit slips and the lack of notation showing hand delivery further undergirds a conclusion that the checks were mailed.   The jury was not unreasonable in concluding, beyond a reasonable doubt, that Sprick used the United States mails in executing this scheme to defraud.

---

[17] United States v. Moody, 903 F.2d 321, 332 (5th Cir. 1990).

[18] Id.

[19] See United States v. Sumnicht, 823 F.2d 13, 15 (2d Cir. 1987).

17

Finally, Sprick contends that there is insufficient evidence to support his convictions for mail fraud on Counts Nine and Eleven, as the evidence does not show that these checks were mailed or issued at his request. Again, we disagree. Sprick opened a post office box in the name of his business, Southwest Senior Services, which box was listed at USG as Mrs. Johnson's address. Two checks totaling $211,000 were mailed to that box, purportedly at Mrs. Johnson's request. The request resulted in the incurring of a substantial early withdrawal penalty that was paid not by Sprick but out of Mrs. Johnson's account with USG. The net funds were then used by Sprick to repay Mrs. Parker after he was threatened with legal action by her nephew. Mrs. Johnson testified that she did not request these withdrawals, that Sprick signed her name without her knowledge or express permission, and that she did not authorize him to use these funds for anything other than her benefit, specifically not to repay Mrs. Parker. There is a surfeit of evidence from which a reasonable jury could find beyond a reasonable doubt that Sprick requested the checks in question by mail in anticipation that they would be delivered by mail, as indeed they were. We conclude that there was sufficient evidence to support the jury's verdict on these counts, and we affirm Sprick's convictions on all six.

D. Money Laundering

Sprick claims that there is insufficient evidence to support his convictions on the seven counts of money laundering under 18 U.S.C. 1956(a)(1)(B)(i) of which he was convicted. To obtain a

18

conviction for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must show that "the defendant conducted or attempted to conduct a financial transaction that he knew involved the proceeds of unlawful activity."[20] Specifically, Sprick argues that, as there is not sufficient evidence to support his convictions on the one count of bank fraud and six counts of mail fraud, the "unlawful activity" predicate for money laundering is missing.

Regarding the predicate bank fraud count, we have already viewed the evidence and construed all reasonable inferences in the light most favorable to the jury's verdict on that count and have ruled that there is not sufficient evidence to support that conviction. It follows, then, that there is no unlawful-activity predicate to support the conviction for the one count of money laundering related to that count of bank fraud. As we have also concluded, however, that there is sufficient evidence to support Sprick's convictions on all six counts of mail fraud, there are sufficient unlawful-activity predicates to support his convictions on each of the six counts of money laundering related to the six counts of mail fraud, and we affirm them.

E. Admission of the Failed E-Mail Transmission

Sprick contends that the evidence of the failed e-mail should not have been admitted at trial because its "probative value [was] substantially outweighed by the danger of unfair prejudice."[21]

---

[20] United States v. Olaniyi-Oke, 199 F.3d 767, 770 (5th Cir. 1999).

[21] Fed. R. Evid. 403.

Clearly, the e-mail is probative, as it is tantamount to a confession by Sprick that he had knowingly committed bank fraud, one of the offenses for which he was charged. There is also no question that the contents of this e-mail, in which he admits guilt, are prejudicial to his case. The question under Rule 403, however, is not whether the evidence is prejudicial <u>vel</u> <u>non</u> but whether it is <u>unfairly</u> prejudicial.

The e-mail did not influence the jury in its assessment of Sprick's guilt in any improper way; rather, its effect corresponds with the purpose for its admission, namely its bearing on Sprick's guilt. Moreover, the jury was properly instructed on the limited purposes for which it could consider the e-mail; namely, to determine Sprick's guilt on the bank fraud charges under consideration at the time of the attempted transmission of the e-mail and not his guilt on the later-added counts of mail fraud and money laundering.[22] Thus, the e-mail had no <u>unfairly</u> prejudicial effect. Given the incontrovertible probative nature of this evidence, the e-mail would have to be unfairly prejudicial in the extreme for Rule 403 to be violated. As that is not the case, the district court acted within its discretion in admitting the evidence and in issuing its instructions to the jury.

---

[22] Although these comments may have heightened the prejudicial effect of the admission of the e-mail, they also served to ensure that the jury would not apply Defendant's confession to the mail fraud or corresponding money laundering counts.

F.  The Amount Laundered

Sprick contends that the amount laundered did not exceed $1,000,000 but in fact totaled only $523,868.13.  This sum equals the total amount of money involved in the one count of bank fraud and the six counts of mail fraud on which he was convicted.  Sprick's approach demonstrates a fundamental misunderstanding of what the district court's finding indicates.  "When calculating funds for sentencing purposes, it is permissible to consider the entire amount the parties <u>intended</u> to launder."[23]  Sprick's claim that  the funds returned to his intended victims should not be considered in finding the amount of money laundered is equally unavailing:  "The money laundering [sentencing] guideline does not depend on loss; it depends on the 'value of the funds' that the defendant laundered."[24]  The record shows that Sprick received approximately $1,918,000[25] from his three victims, some of which he did return to them.  The record demonstrates, however, that on several occasions, Sprick returned the "investments" made by these victims only under duress[26] or when not doing so would have been

---

[23] <u>United States v. Leahy</u>, 82 F.3d 624, 638 (5th Cir. 1996) (emphasis added).

[24] <u>United States v. Allen</u>, 76 F.3d 1348, 1369 (5th Cir. 1996).

[25] Mrs. Johnson invested $1,080,000 with Sprick, Mrs. Parker approximately $800,000, and Mrs. Hallford, $38,000.

[26] For instance, Sprick made the payment of $160,000 to Mrs. Parker only after Mr. Standefer threatened to alert the authorities as to Sprick's behavior were he not to return Mrs. Parker's funds to her.

21

highly suspicious.[27] In light of this and other evidence, it would be reasonable to find that Sprick intended to launder a larger portion of the victims' funds than he ultimately succeeded in laundering. We hold that the district court was not clearly erroneous in finding that the amount laundered exceeded $1,000,000.

## III.

### *Conclusion*

When we view the evidence and make all credibility determinations and reasonable inferences in the light most favorable to the jury's verdict, we find that there is sufficient evidence in the record to support Sprick's convictions on each count with the exception of the one count of bank fraud and the one count of money laundering related to bank fraud, which two convictions we must reverse. We hold that the district court did not abuse its discretion in admitting the failed e-mail transmission despite Sprick's objection based on Federal Rule of Evidence 403, and that it did not commit clear error in finding that the amount laundered exceeded $1,000,000. We therefore reject Sprick's complaints about the evidentiary rulings of the district court and affirm his convictions on all counts of mail fraud and on all money laundering counts related to those counts of mail fraud. We reverse, however, his conviction on the bank fraud count and the one money laundering count related to bank fraud. Consequently, we vacate Sprick's sentence for bank fraud and for the one count of

---

[27] I.e., when Mrs. Hallford demanded repayment of her investment following the divorce of Sprick from Mrs. Hallford's granddaughter.

22

money laundering related to bank fraud, and we affirm all remaining aspects of his sentence.

AFFIRMED in part and REVERSED in part.