In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00221-CR
______________________________


BILLY RAY HENDERSON, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 363rd Judicial District Court
Dallas County, Texas
Trial Court No. F03-34709-UW


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss


MEMORANDUM OPINION

Â Â Â Â Â Â Â Â Â Â Â Â After a Dallas County jury found that Billy Ray Henderson was guilty of delivery of cocaine
to an undercover Dallas police officer and that Henderson had consecutively and finally been
convicted of two prior felony offenses, the trial court sentenced Henderson to life imprisonment. 
After reviewing the entire record on appeal, we affirm Henderson's conviction and sentence because
we find that no reversible error occurred.
Â Â Â Â Â Â Â Â Â Â Â Â At trial and on appeal, Henderson was represented by retained counsel, Kenneth Berry. Berry
submitted a letter to this Court stating he had fully reviewed the reporter's record in this case and
concluded that the appeal was frivolous. He also filed a motion for leave to withdraw as counsel of
record. We ultimately gave Henderson almost four extra months to submit a pro se responsive brief. 
Henderson wrote this Court on June 7, 2004, and outlined several errors he asserts require reversal
of his case. We treat Henderson's letter as his brief.
Â Â Â Â Â Â Â Â Â Â Â Â We begin by addressing a potential issue raised during our independent review of the record,
that is, whether a variance between the indictment and the proof at trial was material. We then
address Henderson's points: prosecutorial misconduct, prosecutorial bolstering of witnesses, the
State's manufacturing of evidence, the State's use of perjured testimony identifying Henderson, the
lack of an alleged culpable mental state in the indictment, the lack of an affirmative link between
Henderson and any contraband, and ineffective assistance of counsel. 
Â 
Indictment's Enhancement Paragraph Variance Not Material
Â Â Â Â Â Â Â Â Â Â Â Â One enhancement paragraph of the indictment alleged Henderson had been convicted of
robbery on December 1, 1989. The proof at trial showed Henderson was actually convicted of
robbery in that case on September 22, 1988. We conclude, however, that the variance between the
allegation and the proof at trial is immaterial. First, the cause number, the county, and the court of
conviction all remain the same. Someone looking for evidence of the conviction could have easily
found it using those remaining characteristics. Second, and most importantly, there was evidence
produced at trial that showed Henderson was not surprised by evidence of the prior robbery
conviction. Henderson's brother testified at trial that he was in the courtroom when Henderson
received a forty-year sentence in 1988 for that robbery conviction. Accordingly, because the
variance between the proof and the indictment was immaterial, no reversible error exists. See
Gollihar v. State, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001) (citing United States v. Sprick, 233
F.3d 845, 853 (5th Cir. 2000)).
No Evidence of Bad Acts by Prosecution
Â Â Â Â Â Â Â Â Â Â Â Â In his letter brief to this Court, Henderson contends his conviction was the result of the same
type of misconduct involved in the recent fake drug scandal that has been connected to the Dallas
Police Department. See, e.g., Matt Stiles, Informants Sentenced in Fake Drug Scandal, Dallas
Morning News, Jan. 22, 2004. But the record does not support Henderson's claim of misconduct
by either the Dallas Police Department crime laboratory or the prosecutor.
Â Â Â Â Â Â Â Â Â Â Â Â The evidence at trial showed that analysts with the Southwestern Institute of Forensic
Sciences (SWIFS) analyzed the drugs sold by Henderson to the undercover officer. SWIFS is a
private laboratory not affiliated with the Dallas Police Department. SWIFS performed three separate
tests of the narcotics in this case and concluded the narcotics sold by Henderson were of a cocaine
base and weighed 1.48 grams. Given the independent nature of the laboratory analysis, as well as
the absence of any other evidence in the record to link Henderson's case to the alleged misconduct
involved in the Dallas Police Department's recent fake drug scandal, we cannot say the record
supports Henderson's claim to the contrary.
Â Â Â Â Â Â Â Â Â Â Â Â We have thoroughly reviewed the record and find no evidence therein of prosecutorial
misconduct, witness bolstering, manufacturing of evidence, or of the use of perjured testimony.
Culpable Mental State Properly in Indictment
Â Â Â Â Â Â Â Â Â Â Â Â Henderson contends the indictment is defective for failing to allege a culpable mental state. 
"[A] person commits an offense if the person knowingly . . . delivers or possesses with intent to
deliver Â a Â controlled Â substance Â listed Â in Â Penalty Â Group Â 1." Â Tex. Â Health Â & Â Safety Â Code
Ann. Â§ 481.112(a) (Vernon 2003). Cocaine is a Penalty Group 1 drug. Tex. Health & Safety
Code Ann Â§ 481.102(3)(D) (Vernon Supp. 2004). The indictment in Henderson's case alleged he
did
unlawfully and knowingly deliver, to-wit: actually transfer, constructively transfer
and Â offer Â to Â sell Â a Â controlled Â substance, Â to-wit: Â COCAINE, Â in Â an Â amount Â by 
Â 
aggregate weight, including any adulterants or dilutants, of 1 gram or more but less
than 4 grams to D. CAWTHON . . .
against the peace and dignity of the State.The indictment alleged the requisite culpable mental state of "knowingly." See Tex. Pen. Code
Ann. Â§ 6.03(b) (Vernon 2003) (defining the culpable mental state of "knowingly").
Henderson Clearly Linked with Contraband
Â Â Â Â Â Â Â Â Â Â Â Â Henderson asserts there was no evidentiary link between him and the cocaine. That is
directly contrary to the evidence clearly showing his exchanging drugs for money with the
undercover officer.
Trial Counsel Not Ineffective
Â Â Â Â Â Â Â Â Â Â Â Â Henderson asserts that Berry, at trial, had "no idea what so ever [sic] on how to fight a drug
case." We evaluate claims of ineffective assistance of counsel under the standards established in
Strickland v. Washington, 466 U.S. 668, 687 (1984).


 See Mitchell v. State, 68 S.W.3d 640, 642
(Tex. Â Crim. Â App. Â 2002). Â Counsel's Â assistance Â will Â be Â held Â ineffective Â if Â an Â appellant Â shows
that (1) trial counsel's performance fell below an objective standard of reasonableness, and (2) a
reasonable probability exists that, but for counsel's alleged errors, the result would have been
different. Strickland, 466 U.S. at 687â88. An appellant bears the burden of proving ineffective
assistance of counsel by a preponderance of the evidence. Moore v. State, 694 S.W.2d 528, 531
(Tex. Crim. App. 1985).
Â Â Â Â Â Â Â Â Â Â Â Â Henderson points to no specific deficiencies or errors Berry allegedly made. In our review
of the record, we find none that we can call ineffective assistance of counsel. In fact, the record
reveals defense counsel Berry was consistently engaged and actively attempting to defend
Henderson.
Â Â Â Â Â Â Â Â Â Â Â Â For the reasons stated, we affirm the trial court's judgment.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Josh R. Morriss, III
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice

Date Submitted:Â Â Â Â Â Â Â Â Â Â June 30, 2004
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â July 1, 2004

Do Not Publish




g egregious harm, but does not
explain how she might have been harmed by the inclusion of the reasonable-doubt instruction.

 The record shows no harm to Ms. Samford by the inclusion of the reasonable doubt
instruction. Many courts have pointed out that language similar to the Geesa definition actually
favors the defendant. Chief Justice Cornelius wrote that, after reading Paulson's description of the
Geesa reasonable-doubt instruction "it is obvious that the majority [of the Paulson court] believed
the definition favored the defendant because, if the jurors properly applied it, they would be less
likely to convict." In re C.S., 79 S.W.3d at 622. With that in mind and "in the complete absence
of any explicit suggestion" by Samford as to how the definition harmed her, we conclude that the
error did not cause Ms. Samford egregious harm. See id. We conclude that any error in including
the reasonable doubt instruction here was harmless error and overrule this point of error.

(4) Including the "Take" Alternative of the Offense in the Jury Charge Was Not Egregiously
Harmful

 The jury charge provided "that it is an offense for a person to take or retain a child." It went
on: "In order to find the defendant guilty you must find from the evidence . . . that the defendant
took or retained a child, [A.S.] . . . that defendant knew at the time that her conduct, if any in taking
or retaining said child. . . ." The application paragraph contains similar references to "take" or
"retain."

 Again, review of asserted jury-charge error involves the two-step process that first looks for
error and then identifies harm from such error. See Abdnor, 871 S.W.2d at 731. Here, the State all
but concedes that inclusion of references to "take" in the charge is error but maintains that the error
is harmless: "The State agrees, that to the extent the charge authorized the jury to convict for on [sic]
a theory of culpability not plead [sic] in the indictment--that is, illegally taking possession of the
child--then it is erroneous. However that does not mean reversal is mandated."

 We observe that, since Ms. Samford did not object to the jury charge's reference to "take,"
she again must show that she suffered egregious harm, that is, whether 

 the error is so egregious and created such harm that [s]he has not had a fair and
impartial trial-in short[,] egregious harm. . . [T]he actual degree of harm must be
assayed in light of the entire jury charge, the state of the evidence, including the
contested issues and weight of probative evidence, the argument of counsel and any
other relevant information revealed by the record of the trial as a whole. 


Trejo v. State, 280 S.W.3d 258, 261 (Tex. Crim. App. 2009) (quoting Almanza, 686 S.W.2d at 171).

 Ms. Samford points to the following note from the jury as evidence of egregious harm: "We
the jury do not agree with the fact that this is a felony offense. That being said, our decision/verdict
was arrived at based on the guideline we were given and the facts of the case." The jury's note went
on to ask questions concerning punishment and community supervision. According to Ms. Samford,
the note demonstrates that the jury struggled with the verdict and, therefore, that she suffered
egregious harm by the error. The note was generated, however, during the punishment phase; the
jury's deliberation relating to guilt/innocence took only twenty-eight minutes. More importantly,
it does not appear that the jury's struggle had anything at all to do with the "take" language. To the
contrary, the jury's note demonstrated only its disagreement with the perceived harshness of
classifying this offense as a felony. In fact, it could be said that the jury's note demonstrates its
understanding (indeed its frustration) that the case involved keeping A.S. for less than a day longer
than allowed under the divorce decree. 

 Certainly, the State never made any allegation that Ms. Samford "took" A.S. in violation of
the divorce decree. The State's theory remained that she kept or "retained" A.S. in violation of the
divorce decree: "So I think we've proved that she knew her conduct in retaining the child was in
violation of the order." Likewise, the reporter's record shows that Ms. Samford did not present
evidence to undermine any theory that she "took" A.S., suggesting that there was no evidence to
show that she did so. Her defensive theory revolved around the conflicts between custody provisions
for odd- and even-numbered years that might be said to create an inconsistency that could somehow
excuse her failure to return A.S. at the proper time. Mr. Samford's testimony makes no mention
whatsoever that Ms. Samford took A.S. from him. In closing argument, the State made clear that
there was no evidence that she "took" A.S.: "Our law provides that is an offense to - now, there's
no talking about taking the child. We're talking about it's in the law."

 The record does not show that Ms. Samford suffered egregious harm. It fails to reveal that
Ms. Samford was at risk of being convicted on a theory not alleged in the indictment. We conclude
that any error from including the "take" language in the jury charge was harmless and overrule this
point of error.





 We affirm the trial court's judgment.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: October 21, 2009

Date Decided: December 17, 2009


Publish
1. See In re Marriage of Samford, cause number 06-08-00085-CV; In re Samford, cause
number 06-08-00024-CV; In re A.S., 06-07-00044-CV; In re Marriage of Samford, cause number
06-05-00040-CV. Ms. Samford and the now late Mr. Samford were married in November 1996. 
They had a son, A.S., in May 1997. The trial court signed its final decree of divorce in the
Samfords' contentious divorce January 25, 2005. The final order awarded divided custody of A.S.
between the two parents equally on a specified schedule.
2. In at least one of the previous Samford cases that have come before us, the son was
identified by his initials pursuant to Section 109.002(d) of the Texas Family Code. So as not to
undermine the intent of the authority granted by Section 109.002(d), we will continue to identify the
son by his initials. See Tex. Fam. Code Ann. § 109.002(d) (Vernon 2008).
3. Though she initially and repeatedly refused to apply for community supervision, ultimately,
Ms. Samford was sentenced to two years' community supervision.
4. There is discussion in the record about Mr. Samford's speculation as to Ms. Samford's
motive in retaining A.S. Mr. Samford and A.S. were scheduled to go on a Cub Scout outing to the
Johnson Â Â Space Â Â Center Â Â for Â Â a Â Â camp-in Â Â and Â Â other Â Â activities Â Â that Â Â weekend, Â Â leaving
Saturday. Â Mr. Samford speculates that, although he made some effort to keep the details of the plan
a secret from his ex-wife, she discovered the departure date and made an effort to ruin the outing. 

5. As will be discussed in more depth, even if the requested instruction is an accurate statement
of the law, there is no harm in its denial if it is substantially the same as one already contained in the
court's charge or if the subject matter it concerns is adequately covered in the court's charge. See
Valentine v. State, 587 S.W.2d 399, 402 (Tex. Crim. App. 1979).
6. There is some confusion as to the breadth of Paulson's holding. While the court noted that
it was the better practice not to include a definition of reasonable doubt, it did not clearly state that
doing so in the absence of an agreement was reversible error. See Vosberg v. State, 80 S.W.3d 320,
323-24 (Tex. App.--Fort Worth 2002, pet. ref'd); Dooley v. State, 65 S.W.3d 840, 844 (Tex.
App.--Dallas 2002, pet. ref'd).