# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00757-CR

**Robert Salazar, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM COUNTY COURT AT LAW NO. 4 OF TRAVIS COUNTY
### NO. C-1-CR-09-501033, HONORABLE MIKE DENTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Robert Salazar of the misdemeanor offense of violation of a protective order, and pursuant to a plea bargain on punishment, the trial court sentenced Salazar to 180 days in jail. In his sole issue on appeal, Salazar contends that the trial court erred in denying his motion for instructed verdict, alleging that there was a fatal variance between the victim identified in the charging instrument and the victim identified in the trial evidence. We will affirm the judgment of conviction.

## BACKGROUND

The jury heard evidence that Salazar's girlfriend, Yolanda Barrera, applied for a protective order against Salazar, to which Salazar agreed. The two-year protective order, effective April 3, 2009, prohibited Salazar from, among other things, communicating—"in any manner whatsoever except through attorneys"—with any protected parties named in the order, including

Yolanda and her daughter, Rudi Barrera.[1]  Shortly thereafter, Salazar was charged with violating the

protective order by mailing a letter from jail to Yolanda's home.  The handwritten letter is addressed

to "Yolanda" and contains a suggestion of secret communication:  "As you well know [I] would like

to talk to you [a]bout this matter.  Please let's talk, on the cool no one has to know, let me know.

Can send a message through O.B.'s mail no one checks that."

Salazar's June 9, 2009 charging instrument in the clerk's record alleges:

> Robert Salazar II, the Defendant, on or about May 9, 2009, did then and there intentionally, knowingly, and recklessly violate an order of County Court at Law Four, Travis County, Texas, Protective Order #C1CV09003018, dated April 3, 2009, by intentionally and knowingly communicating with *Rudi Barrera*, a protected person, in a manner other than through the Defendant's attorney, to wit: the Defendant sent a letter to *Rudi Barrera*, as specifically prohibited by said order, and the Defendant knew that said Protective Order was in effect, AGAINST THE PEACE AND DIGNITY OF THE STATE.

(Italics added, capitalization in original.)

After Yolanda testified that she received the letter one month after the entry of

the protective order, that the envelope containing the letter was addressed to her residence in

Travis County, that Salazar's name and location of incarceration in Del Valle were listed as the

return address, that she recognized the letter's handwriting as Salazar's, and that Salazar knew about

the specific incidents referenced in the letter, the State rested its case.

Before the defense began its presentation of evidence and outside the presence of

the jury, the trial court called a bench conference to discuss a potential variance that it identified

between the charging instrument on file and the trial evidence.  The court observed that the charging

instrument on file alleged that Salazar violated the protective order by sending a letter to "Rudi,"

---

[1]  For clarity, we will refer to Yolanda Barrera and Rudi Barrera by their first names.

but the jury heard evidence that a letter was sent to "Yolanda." The State then produced: (1) a file-stamped copy of its motion to amend the charging instrument in this cause to allege Yolanda as the victim; (2) a file-stamped copy of the trial court's signed order granting the State's motion to amend;[2] and (3) a confirmation sheet showing that the prosecutor sent the proposed amendment to Salazar's counsel by facsimile transmission on August 3, 2010, more than two months before trial. Given that evidence—and the lack of any defense objection when the charging instrument was read with Yolanda's name during formal arraignment on the day of trial—the court ruled that Salazar's counsel had been properly served with the amendment.

Following that ruling, Salazar made a motion for directed verdict contending that "[t]he evidence d[id] not support the pleadings." The trial court denied the motion. Trial proceeded, the jury found Salazar guilty of the misdemeanor offense of violation of a protective order, *see* Tex. Penal Code Ann. § 25.07(a)(2)(c), (g) (West Supp. 2010), and the trial court sentenced Salazar to 180 days in jail pursuant to his plea bargain on punishment.

## ANALYSIS

**Preservation of error**

Salazar contends that the trial court erred in denying his motion for instructed verdict[3] when a fatal variance existed between the charging instrument and the State's trial evidence. Specifically, Salazar asserts that the information charges him with violating a protective order by

---

[2] There is no explanation why the motion and order are omitted from the clerk's record. They are attached as an exhibit to the reporter's record.

[3] Salazar's issue on appeal refers to a motion for "instructed" verdict, but the record shows that he sought a "directed" verdict. "Directed verdict" and "instructed verdict" are used interchangeably. Black's Law Dictionary 1696, 1697 (9th ed. 2009). For accuracy, we will refer to the directed verdict motion that Salazar sought at trial.

3

sending a letter to "Rudi Barrera," a protected person listed in the order, but the evidence at trial showed that Salazar sent a letter to "Yolanda Barrera," Rudi's mother.

The State contends that the charging instrument was successfully amended, with notice to Salazar, such that no variance existed at trial. But as a preliminary matter, the State argues that Salazar's point of error is not preserved for our review because he never objected to the State's amended charging instrument, never claimed surprise or requested a continuance to prepare, and never specified the elements lacking from the State's proof in his motion for directed verdict. *See* Tex. R. App. P. 33.1(a).

During the bench conference after the close of the State's evidence, the trial court stated:

> THE COURT: [T]he defendant has been charged with two counts of violation of protective order, sending letters to two different people and I'm going to use the first names, Yolanda and Rudi. In the file before the Court today, there is an information that seems to say Rudi, while it's obvious from the evidence we're trying the case about a letter to Yolanda, and so I've asked the lawyers do we have a problem and I've been told the case was amended and in fact there's an amendment that shows that the information is for Yolanda, and in fact under this cause number we're proceeding for an offense alleged to have been committed against Yolanda, but there wasn't an amendment in the file. So anyways, the lawyers have been given a chance to sort that out for the Court, and so somebody help me out here.

The court was then informed that the State filed two protective order violations against Salazar, one pertaining to Yolanda and another pertaining to Rudi, both of whom were "protected persons" under the agreed order. The charging instrument in the clerk's record in this case charged Salazar with violating a protective order by mailing a letter to Rudi. However, the State presented the court with

4

a file-stamped copy of its August 6 motion to amend the charging instrument to allege Yolanda as the victim, a file-stamped copy of the trial court's August 6 signed order granting that motion to amend—which the court acknowledged that it signed—and an August 3 confirmation sheet showing the prosecutor's successful fax delivery of the proposed amendment to Salazar's counsel, all of which occurred more than two months before trial.

When the trial court asked specifically about whether defense counsel had notice of the amendment, Salazar's counsel offered nothing and did not deny receipt of the State's motion to amend:

THE COURT: Mr. Blackburn, is your number [phone number]?

[Defense counsel]: I believe so.

THE COURT: So I have at least evidence in front of me that would indicate that you were faxed this back in August so that's quite sometime ago, at least a proposed amendment if they sent to you on August 3.

. . . .

THE COURT: Do you dispute that they sent you that motion that their fax seems to indicate that they did?

[Defense counsel]: I have *no evidence* to present to the Court *that they did not send that fax*.

THE COURT: So they could have and you don't remember? Or Adam could have got it? Mr. Reposa is not present I know right now, or obviously a staff member in your office may have picked it up and given it to either one of you et cetera, we don't know is what you're telling me? Are you telling me you've never seen the amendment or just don't know?

[Defense counsel]: Your Honor, I went and visited with [prosecutor] Natalie Fowler in her office after a prior—before a prior trial setting and I remember going through all of the files, including all the

5

exhibits that have been offered prior to this discussion.[4] And my notes do not indicate, *I don't have anything to tell you that they did not give me this notice*.

(Emphasis added.) When all parties responded that they had nothing further for the court to consider on the variance issue, the trial court issued its ruling:

THE COURT: I do have that facsimile that seems to indicate that it in fact was faxed through to defense counsel's office many weeks before this setting. When you read the charge this morning, State, did you read complainant Yolanda?

[Prosecutor]: I did, Your Honor.

THE COURT: And there weren't any objections or statements from defense either I guess I should add that to the record as well, obviously the record reflects that. I'm going to proceed because it appears the State in fact served defense counsel with this amendment, it was then signed apparently shortly thereafter and file stamped at the clerk's office. The fact that it's not in the clerk's file concerns me a great deal, but the fact that it is in fact stamped by the clerk's office, it clearly says Dana DeBeauvoir's office filed stamped means it was in the clerk's office where it was file[] stamp[ed] not in the courtroom or someplace else. . . . I will just say for the record it appears to me that there's a proper completed facsimile from the [S]tate to defense counsel showing the amendment some many weeks before this hearing, and so I'm going to accept that as proper service.

Salazar then proceeded to make his motion for directed verdict, and the court asked counsel to provide some clarification:

---

[4] A file-stamped copy of the State's "Motion to Amend Information" and a signed, file-stamped copy of the "Order of Amendment," both attached to the reporter's record as Court's Exhibit No. 2, were offered and admitted during the bench conference.

THE COURT: Is there anything we need to do out of the presence of the jury at this time? Either side?

[Defense counsel]: I would ask for a ruling on a Motion for Directed Verdict.

THE COURT: Okay, what is it the State has failed to prove, what element?

[Defense counsel]: The evidence does not support the pleadings.

THE COURT: That's kind of vague, you want to point me to a specific element they failed to prove? I don't have my notes in front of me because I've handed my file to you, but as I wrote through in my mind the dates that were given, the location w[as] given, without saying whether I believe it or not, the complainant has testified that she received a letter that she recognized as his handwriting as well as there being some details in it made her believe that it was from your client, and a protective order has been issued saying, well one the protective order is in evidence, and I believe they had testimony as to service of the defendant also. If I'm wrong tell me, but I'm trying to click off the elements since you've given me such a vague motion, but I can't think of an element that they don't have some evidence. Without saying whether I believe it or not, or does it rise to the level to convince a jury beyond a reasonable doubt I'm not saying, but I think they've introduced evidence that a jury could use to find each and every one of those elements. If I'm wrong, correct me, if not I will deny your motion. Anything else on the record?

[Defense counsel]: That's all, Your Honor.

Based on this exchange, the State argues that Salazar failed to preserve error because his motion for directed verdict was insufficiently specific to make the trial court aware of the deficient element or elements of the State's proof. While Salazar's response to the court's inquiry about the basis for the directed verdict could have been clearer, we conclude that the specific grounds for the directed verdict were apparent from the context because of the timing of the motion,

7

which was made immediately after defense counsel's fatal-variance argument. *See* Tex. R. App. P. 33.1(a)(1)(A). We will therefore address the merits of Salazar's point of error.

**Denial of directed verdict for fatal variance**

Salazar challenges the denial of his motion for directed verdict, arguing that a fatal variance existed between the charging instrument and the evidence at trial. A "variance" occurs whenever there is a discrepancy between the allegations in the charging instrument and the proof offered at trial. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001)). A variance is considered an evidentiary sufficiency issue. *Gollihar*, 46 S.W.3d at 247. In most variance situations, the State has successfully proven the defendant guilty of a crime, but it has proven the commission of the crime in a manner that varies from the allegations in the charging instrument. *Id*. at 246. Thus, the variance usually presents only a notice problem. *Fuller v. State*, 73 S.W.3d 250, 253 n.2 (Tex. Crim. App. 2002) (internal citations omitted).

A challenge to the trial court's denial of a directed verdict is "in actuality a challenge to the sufficiency of the evidence to support the conviction." *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993) (quoting *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990)). In reviewing the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Bigon v. State*, 252 S.W.3d 360, 366 (Tex. Crim. App. 2008). If the evidence is sufficient to sustain the conviction, then the trial court judge did not err in overruling the defendant's motion for directed verdict. *Madden*, 799 S.W.2d at 686.

A variance between the wording of a charging instrument and the trial evidence is fatal only if the variance is material and prejudices the defendant's substantial rights. *Gollihar*, 46 S.W.3d at 257 (quoting *United States v. Sprick*, 233 F.3d 845, 853 (5th Cir. 2000)). The test for materiality involves a two-pronged inquiry into whether a defendant's substantial rights have been prejudiced. *Santana v. State*, 59 S.W.3d 187, 195 (Tex. Crim. App. 2001). We must determine (1) whether the charging instrument, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial and (2) whether prosecution under the deficiently drafted charging instrument would subject the defendant to the risk of being prosecuted later for the same crime. *Id.* (quoting *Gollihar*, 46 S.W.3d at 257). "The object of the doctrine of variance between allegations of an indictment [or other charging instrument] is to avoid surprise, and for such variance to be material it must be such as to mislead the party to his prejudice." *Cole v. State*, 611 S.W.2d 79, 82 (Tex. Crim. App. 1981) (internal citations omitted). It is well established that the burden of demonstrating surprise or prejudice based on a variance between a charging instrument and the proof at trial is borne by the defendant. *Santana*, 59 S.W.3d at 194. Only a material variance between the charging instrument and the proof at trial will render the evidence insufficient. *Gollihar*, 46 S.W.3d at 257.

Whether a variance existed at all depends on whether the original charging instrument naming Rudi was properly amended to name Yolanda. The Texas Court of Criminal Appeals recognizes that physical alteration of the charging instrument is not the exclusive method of accomplishing an amendment. *Riney v. State*, 28 S.W.3d 561, 565 (Tex. Crim. App. 2000). Instead, it is acceptable for the State to proffer its amended version of the original charging instrument for the trial court's approval, and if approved, the amended version need only be incorporated into

the record under the court's direction, pursuant to article 28.11, with the defense's affirmative assent and knowledge. *Id*. at 565-66; *see* Tex. Code Crim. Proc. Ann. arts. 28.10 (permitting amendment of charging instrument before trial with notice to defendant and after trial commences if defendant does not object), .11 ("All amendments of an indictment or information shall be made with the leave of the court and under its direction.") (West 2006). In *Riney*, the State produced a photocopy of the original indictment, interlineated and incorporated into the court clerk's file, all with the defendant's knowledge and approval. *Id*. at 566. Although the court of criminal appeals cautioned that neither the motion to amend the charging instrument nor the trial court's granting of the motion alone could constitute an amendment, extra steps taken to comply with the code of criminal procedure promoted the functions of keeping the defendant abreast of the charges against him and giving him adequate knowledge to prepare an appropriate defense. *Id*.

This record reflects that: (1) the State amended the charging instrument before trial to name Yolanda as the victim; (2) the trial court found that the proposed amendment had been served on the defense "many weeks" before trial; (3) the trial court acknowledged that "in fact there's an amendment that shows that the information is for Yolanda, and in fact under this cause number we're proceeding for an offense alleged to have been committed against Yolanda"; (4) the State read the amended, previously served charging instrument to the jury during Salazar's formal arraignment, incorporating it into the record; and (5) the defense did not object when the amended charging instrument was read. *Cf. Serna v. State*, 69 S.W.3d 377, 380 (Tex. App.—El Paso 2002, no pet.) (holding that indictment was not amended where defendant objected to amended indictment and amended indictment was not filed nor was it read into the record). Under the circumstances presented by this record, we conclude that the amendment of the charging instrument met the

10

requirements of articles 28.10 and 28.11 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. arts. 28.10, .11; *Riney*, 28 S.W.3d at 565-66.

**No proof of surprise or prejudice**

Even if we were to assume that the charging instrument's amendment was ineffective, a variance between the allegations and the proof will not render the evidence insufficient if the defendant was not surprised or prejudiced by the variance. *Valenti v. State*, 49 S.W.3d 594, 598 (Tex. App.—Fort Worth 2001, no pet.).

Salazar never states affirmatively that he was surprised by the amendment of the charging instrument, instead he carefully suggests to this Court that "there remains the legitimate question of whether he was surprised by the amendment at the time of trial." The State contends that Salazar was not surprised by the amendment, and that he fully expected to defend against the amended allegations naming Yolanda in the charging instrument because: (1) defense counsel reviewed documents in the prosecutor's office before trial, which would have included the amended charging instrument; (2) Salazar did not object when the amended charging instrument naming Yolanda was read at trial; and (3) Salazar did not object to Yolanda's trial testimony.

Salazar's suggestion of surprise stands in contrast to this record, which includes the affidavit for Salazar's warrant of arrest and detention, filed May 27, 2009, showing that Salazar had notice that the victim's name in the underlying cause was Yolanda Barrera:

> Robert Salazar violated the protective order when . . . : *Yolanda Barrera* reported that on 05/02/09, she received a handwritten letter, addressed to her, from Robert Salazar. *Yolanda Barrera* recognized the handwriting and signature in the letter, as that of Robert Salazar.

11

(Emphasis added.)  Additionally, Salazar offers no evidence to dispute that the State sent a copy of its motion to amend by facsimile transmission to Salazar's counsel and that Salazar's counsel received that facsimile transmission more than two months before trial.[5]  After receiving the fax, Salazar did not object to the proposed amendment of the charging instrument, he did not object during his formal arraignment when the charging instrument was read identifying his victim as "Yolanda Barrera," and he informed the court that he had no objections or changes to the jury charge naming "Yolanda Barrera" as the victim of his offense.

Based on this record, Salazar has not met his burden of showing that the variance affected his ability to prepare an adequate defense at trial or that prosecution under the original charging instrument would subject him to the risk of being prosecuted later for the same crime that was tried.  As the court of criminal appeals has observed, if an appellant were prosecuted again, he could avail himself of not merely the charging instrument but the entire record.  *Santana*, 59 S.W.3d at 195 (citing *Gollihar*, 46 S.W.3d at 258).  The record here indicates that the pretrial arrest warrant affidavit, the charging instrument that was read to the jury, the trial evidence, and the jury charge identified Yolanda as the victim of Salazar's violation of the agreed protective order.  With this record, Salazar is in no danger of being prosecuted again for the same violation of the agreed protective order that was proved at trial.  *See Gollihar*, 46 S.W.3d at 258.

---

[5] Defense counsel's remarks during voir dire also suggest that Salazar had notice that trial was for the protective order violation involving Yolanda.  The record shows that defense counsel alluded to the proof that an "applicant" must make for the issuance of a protective order and offered an example of what a girlfriend could say in an affidavit in support of her application—"maybe even in this very court"—for a protective order against her "boyfriend."  There were several protected persons in the agreed protective order against Salazar but only one applicant—his girlfriend, Yolanda Barrera.

12

Because Salazar has not shown surprise or prejudice based on the discrepancy between the original charging instrument and the proof at trial, he has not demonstrated a material variance that would render the evidence insufficient and entitle him to a directed verdict. *See Santana*, 59 S.W.3d at 195; *Gollihar*, 46 S.W.3d at 258; *Valenti*, 49 S.W.3d at 598. This record, including the letter that Salazar wrote to Yolanda and sent from jail to her home during the time that the agreed protected order was in effect, shows that the trial evidence was sufficient to sustain Salazar's conviction. Accordingly, we conclude that the trial court did not err in denying Salazar's motion for directed verdict. *See Madden*, 799 S.W.2d at 686. Salazar's sole point of error is overruled.

## CONCLUSION

Having overruled Salazar's sole point of error, we affirm the trial court's judgment of conviction.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   September 28, 2011

Do Not Publish