United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 17, 2003**

Charles R. Fulbruge III
Clerk

In the
# United States Court of Appeals
## for the Fifth Circuit

_____

m 02-31170

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ELIZABETH BOYETT SMITH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
m 01-CR-348-1-N

_____

Before SMITH, BARKSDALE, and CLEMENT,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

A jury found Elizabeth Smith guilty of arson, mail fraud, conspiracy, witness tampering, and the use of fire in the commission of a felony. She raises five claims of trial error and contends that the district court misapplied the sentencing guidelines and that part of her sentence violates the double jeopardy clause of the Fifth Amendment. Finding only harmless error with respect to one evidentiary issue, we affirm.

I.

The underlying facts have their origin in a scene familiar to many households: A mother asks her son to perform a simple chore, he refuses, and she ends up having to hire one of the kids from the neighborhood to do the job

instead. Although ordinarily this would not land anyone in federal prison, it is also not the typical mother who would ask her son to set fire to a motel. Smith did just that. Motivated by a desire to collect on a $325,000 insurance policy, she asked her son, Johnathon Williams, to set fire to a motel she owned. When he refused, Smith turned to Josh Booty, a family friend, and offered to buy him a truck if he would burn down the motel.

Acting under Smith's direction, Booty borrowed a truck from Williams's roommate, Anthony Turnley, and drove to the motel, where he used a set of keys given to him by Smith to enter the unoccupied motel, spread gasoline in several of its bedrooms, and set them (and nearly himself) on fire. Though damaged by the fire, the motel was not completely destroyed. Smith, meanwhile, created an alibi for herself by driving to another city with her husband, Spencer Smith. She later made statements to the FBI, the insurance company, and the grand jury accusing, among others, the fire chief, mayor, and former police chief of setting the fire.

It did not take long for these well-laid plans to go up in smoke. When Booty returned the truck to Turnley that night, he was carrying a revolver, his eyebrows were singed, and he "reeked like a barn fire." Startled by Booty's appearance, Turnley asked Booty what he had used the truck for, and was told about the fire and Smith's role in planning it.

The next day, after Turnley found the gas cans Booty had left in the bed of his truck, Turnley's father called the fire department and turned over the cans as evidence. That started an investigation in which Turnley and Booty cooperated with the Bureau of Alcohol, Tobacco and Firearms ("ATF") by tape recording numerous conversations between themselves and Smith in which she acknowledged her role in the conspiracy and cover-up. The government prosecuted Smith on the basis of those tapes and the testimony of Booty, Turnley, and Spencer Smith. A jury returned a verdict of guilty on all seven counts.[1]

II.

Smith claims a new trial is warranted by the jury's potential exposure to extrinsic evidence. At the beginning of the trial, the government provided jurors with a binder containing transcripts of the surveillance tapes it planned to introduce into evidence. One of those transcripts, detailing a statement Williams made to the ATF, was for a tape that the government did not introduce into evidence. During its deliberations, however, the jury sent a note to the court asking to see a copy of "Johnathon's Statement to ATF," indicating it at least was aware of the existence of the extrinsic evidence.

The court refused the request, explaining that the tape was not evidence that could be used in deliberations. At no time did the transcript enter the jury room. On this basis, Smith argues that the verdict is tainted by an exposure to improper evidence and that the district court abused its discretion in denying her motion for a new trial without questioning the jurors on their exposure to the transcript.

---

[1] The seven counts are (1) conspiracy to commit arson and mail fraud, in violation of 18 U.S.C. § 371; (2) arson, in violation of 18 U.S.C. § 844(i); (3) mail fraud, in violation of 18 U.S.C. § 1341; (4) use of fire to commit a felony, in violation of 18 U.S.C. § 844(h); and (5)-(7) three counts of witness tampering, in violation of 18 U.S.C. 1512(b).

2

We review only for abuse of discretion a court's handling of complaints of outside influence on the jury. *United States v. Sylvester*, 143 F.3d 923, 931 (5th Cir. 1998). "In granting a broad discretion to the trial judge, we acknowledge and underscore the obvious, that the trial judge is in the best position to evaluate accurately the potential impact of the complained-of outside influence." *United States v. Ramos*, 71 F.3d 1150, 1153-54 (5th Cir.1995). The initial presumption that the jury is impartial can be overcome by evidence that an extrinsic factual matter affected deliberations. *United States v. Kelley*, 140 F.3d 596, 608 (5th Cir. 1998).

The district court did not err in denying Smith's motion without first questioning the jurors on their exposure to the transcript. A district court is not required to conduct a "full-blown evidentiary hearing in every instance in which an outside influence is brought to bear upon a petit jury." *Ramos*, 71 F.3d at 1153. Rather, the court "must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct." *Id.*; *United States v. Bernard*, 299 F.3d 467, 476-77 (5th Cir. 2002), *cert. denied*, 123 S. Ct. 2572, *and cert. denied*, 123 S. Ct. 2572 (2003). The court is not required to conduct an investigation into claims of exposure that are merely speculative. *Kelley*, 140 F.3d at 608.

There is scant evidence that the jury was exposed to the contents of the transcript. The jury was aware at least of the existence of the transcript; otherwise, it could not have known specifically to request a copy of "Johnathon's Statement to ATF." This much, however, is explained by the fact that the transcripts in the jurors' binders were separated and identified by tabs, one of which was visibly labeled "Johnathon's Statement 2." Moreover, on multiple occasions, trial testimony refers to the fact that Williams spoke with ATF agents. As a result, the mere fact that the jury was aware of the existence of the transcript does not prove that any individual juror read, or was exposed to, the contents of the transcript.

In addition, there is no reason to believe that the jury had meaningful exposure to the evidence contained in the transcript. In denying a new trial, the court detailed the procedures it had used to limit the jury's access to the transcripts:

> The jury was never afforded the opportunity to turn to that transcription . . . and read only the transcript of the statements which were contemporaneously played into evidence, and through the earphones provided each juror. The jurors were instructed to pick up their books at the beginning of a recording, to turn to the appropriately tabbed transcript and to read along. At the end of each recording, the jurors placed their books of transcripts down beside their seats as instructed at the outset, and turned their attention to evidence emanating from the witness stand.

Smith does not dispute these facts and instead suggests only one possible opportunity by which a juror could have seen and read Williams's statement. This is mere speculation that does not trigger the requirement of a broader investigation.[2] *Id.*

---

[2] Needless to say, the government's practice of handing out intended exhibits en masse before in-
(continued...)

3

Because Smith has shown that the jurors were at least minimally exposed to the transcript, inasmuch as they knew the statement was in their binders, we must consider whether that exposure had a prejudicial effect on the verdict. Smith argues that it is the government's burden to prove that the exposure was harmless. Although this was once the law of the circuit, *see, e.g.*, *United States v. Luffred*, 911 F.2d 1011, 1014 (5th Cir. 1990), it is no longer the case that any intrusion on the jury, no matter how slight, creates a rebuttable presumption of prejudice to the defendant. In *Sylvester*, 143 F.3d at 932-34, we recognized that *Smith v. Phillips*, 455 U.S. 209 (1982), and *United States v. Olano*, 507 U.S. 725 (1993), undermined the presumption of prejudice.[3] Consistent with our longstanding rule that a district court is entitled to discretion in investigating and resolving charges of jury tampering, we held in *Sylvester*, 143 F.3d at 934, that "only when the court determines that prejudice is likely should the government be required to prove its absence."

To exercise this discretion properly, a district court must examine the complained-of intrusion on the jury and determine whether it is of a nature and degree that is likely to have a prejudicial effect. In some cases, the intrusion will be as serious as that in *Remmer v. United States*, 347 U.S. 227 (1954), in which the Court held that an attempt to bribe a jury foreman was presumptively prejudicial to the defendant. At the other end of the spectrum are cases like the present one, in which the defendant can do no more than show that the jury improperly learned of the existence of a transcript, but nothing of its contents. Given such a *de minimis* intrusion on the jury, it is not an abuse of discretion for the district court to require some evidence of a prejudicial effect before burdening the government with a requirement that it prove the intrusion harmless.

The district court did not abuse its discretion in finding that Smith was unable to make a colorable showing of prejudice. Unlike the situation in *Luffred*, 911 F.2d at 1015, on which Smith heavily relies, the transcript of Williams's statement did not make it into the jury room and could not have been referenced during deliberations. In addition, the evidence in Williams's statement was largely cumulative of testimony that was properly before the jury.[4] Smith is not entitled to a new trial on this ground.

### III.

Smith raises two challenges to the evidence. She argues first that the district court committed reversible error by overruling an objection to the government's cross-examination of Spencer Smith. We review evidentiary rulings for abuse of discretion. *United States v. Sprick*, 233 F.3d 845, 852 (5th Cir. 2000). Even if we find error, rulings are subject to the harmless error balancing test. *United States v. Parker*, 133 F.3d 322, 328 n.3 (5th Cir. 1998); *United States v. Pace*, 10 F.3d 1106, 1116 (5th Cir. 1993).

---

[2](...continued)
troducing them into evidence is risky.

[3] One court of appeals has reached the same conclusion. *See United States v. Williams-Davis*, 90 F.3d 490, 496-97 (D.C. Cir. 1996); *but see United States v. Dutkel*, 192 F.3d 893, 896 (9th Cir. 1999).

[4] Williams's statement was relevant only to corroborate Booty's claim that the fires were set at Smith's behest, and this was sufficiently done by Williams's confirmation, in a separate audiotape and transcript admitted into evidence, that Smith had first asked him to set the fires.

During cross-examination, the government's attorney asked Spencer Smith: "Are you aware that two weeks ago, your wife called Keisha and Meredith [and] asked if they would testify today that Josh Booty was at Kristenwood on January 23rd, as late as 8:00 o'clock?" Spencer Smith responded: "Yes." Because the question was asked in this form, it was impossible for the jury to determine whether Spencer Smith was testifying solely that the phone call occurred, or whether he also was confirming the government's allegation that the purpose of the call was to affect testimony. The defendant properly objected on the ground that this compound question assumed facts not in evidence, and the objection should have been sustained.[5]

Nevertheless, the error was made harmless by subsequent questioning. Spencer Smith indicated in response to one question that he was aware his wife had made the calls, and in response to another that he thought she was merely "trying to get some answers."[6] The

error is also rendered harmless beyond a reasonable doubt by the overwhelming evidence of defendant's complicity in the arson, conspiracy, and subsequent cover-up. Much of the evidence comes in the form of her own tape-recorded statements and therefore is highly reliable.[7]

Smith's remaining evidentiary issue is also without merit. She contends that one of the government's experts offered an opinion that exceeded the pre-trial disclosure mandated by FED. R. CRIM. P. 16(a)(1)(G) and that the district court should have remedied this violation by striking the offending testimony. A district court's remedies for alleged discovery violations are reviewed for abuse of discretion. *United States v. Katz*, 178 F.3d 368, 369 (5th Cir. 1999).

The expert, ATF agent Daniel Hebert, testified that it was more likely that several plastic water jugs discovered near the motel had been

---

[5] One prominent treatise explains the rule against asking questions that assume facts not in evidence: "A common vice is for the examiner to couch [a] question so that it assumes as true matters to which the witness has not testified, and which are disputed between the parties . . . . [W]hether the witness is friendly or hostile, the answer can be misleading. If the witness answers the question without separating out the assumption, it is impossible to determine whether the assumption was ignored or affirmed." MCCORMICK ON EVIDENCE § 7 (5th ed. 1999).

[6] Smith mistakenly asserts that the improper questioning denied her the right to cross-examine a person with personal knowledge of the contents of the phone call, and thus rises to the level of a constitutional violation. This contention is erron-
(continued...)

[6](...continued)
eous, for Smith's solicitation of perjury is itself a verbal act, not hearsay. *See, e.g.*, *United States v. Villareal*, 764 F.2d 1048, 1050 n.2 (5th Cir. 1985); *Morgan v. State*, 741 So. 2d 246, 257 (Miss. 1999). Spencer Smith's testimony was, therefore, competent evidence.

[7] At oral argument, Smith argued for the first time that this question also improperly introduced evidence of a prior bad act of the defendant, in violation of FED R. EVID. 404(b). Because Smith did not object on this basis at trial, our review is only for plain error. *United States v. Duffaut*, 314 F.3d 203, 209 (5th Cir. 2002); FED. R. EVID. 103(d). Insofar as the question focuses on Smith's attempts further to cover up the crime, the district court would not have plainly erred in concluding that the question sought evidence relating to the pending conspiracy charge and not to a prior bad act.

planted as evidence than used in the arson, because they were in too good a condition to have been sitting outside during the three months before their discovery. The jugs also still smelled faintly of gasoline, which Hebert testified was unlikely to be the case if they had last contained gasoline at the time of the arson.

This evidence was relevant to prove Smith's role in the conspiracy. In April 2001, she contacted Hebert, claiming to have "discovered" the jugs in the grass behind the motel. She did not realize, at that time, that the ATF had already tape recorded numerous conversations in which she castigated Booty for leaving the gas cans used in the arson in Turnley's truck. In those tapes, Smith blamed herself for not telling Booty to throw the cans into the swamp. The government argued that she planted the water jugs at the scene, incriminating herself in the conspiracy.

Characterizing Hebert's testimony as an expert opinion on gasoline dissipation rates, defense counsel objected and asked that the testimony be struck. Rather than grant that request, the court interrupted the examination of Hebert to permit a *voir dire* inquiry into the basis of the witness's opinion. This eliminated the risk of surprise and allowed defense counsel to obtain Hebert's admission that he could not say, with any specificity, when the gas cans were placed at the scene. The district court's remedy therefore was no abuse of discretion.[8]

IV.

Smith challenges the district court's conclusion that the motel is a "dwelling" within the meaning of U.S.S.G. § 2K1.4(a)(1)(B). She apparently concedes that the motel would be a dwelling while occupied, but argues that it ceased to be a dwelling during the three-month seasonal vacancy during which the arson took place. An interpretation of the sentencing guidelines is a question of law that we review *de novo*. *United States v. Sanders*, 343 F.3d 511, 520 (5th Cir. 2003).

In a matter of first impression in this circuit, we agree with the government and several of our sister circuits that a hotel room counts as a "dwelling" within the meaning of § 2K1.4(a)(1)(B), regardless of whether it is occupied at the time of the crime.[9] Black's Law Dictionary defines a dwelling in connection with the crime of arson as, in relevant part, "an enclosed space, permanent or temporary, in which human beings usually stay, lodge, or reside."[10] A motel room easily fits this definition.

The only question, therefore, is whether the nature of the motel as a dwelling changed during its three-month seasonal vacancy. Smith,

---

[8] Two other issues raised by Smith are meritless. Contrary to her claims, the government did not misstate the evidence in its closing argument. In addition, insofar as we have found Smith's other allegations of error to be lacking, she was not prejudiced by an accumulation of harmless errors.

[9] *See United States v. Ray*, 245 F.3d 1256, 1257 (11th Cir. 2001); *United States v. McClenton*, 53 F.3d 584, 587 (3d Cir. 1995); *see also United States v. Barker*, 208 F.3d 215 (table), 2000 U.S. App. LEXIS 3666, at *5-*7 (6th Cir. Mar. 7, 2000) (unpublished) (holding that it was not plain error to conclude that an occupied motel is a dwelling for purposes of the sentencing guidelines).

[10] *See* BLACK'S LAW DICTIONARY 524 (7th ed. 1999) (quoting 5 AM. JUR. 2D *Arson and Related Offenses* § 13, at 789 (1995)).

relying on *United States v. Jackson*, 22 F.3d 583 (5th Cir. 1994), argues that § 2K1.4(a)-(1)(B) should not apply here, because Booty knew the motel was unoccupied and that the arson posed correspondingly little risk of danger to an inhabitant. In *Jackson*, we refused to apply a portion of the sentencing guidelines that defines burglary of a dwelling as a "crime of violence," on the ground that the burglary took place in a building that had been vacant for seven years. "Logically, whether by vacancy, physical deterioration, altered use, or otherwise, a point in time exists at which a dwelling loses its character as a residence and becomes a 'mere' building." *Jackson*, 22 F.3d at 585.

There is, however, a marked difference between the seven-year abandonment of the building in *Jackson* and the three-month seasonal vacancy of the motel. Whatever the "point in time" at which a building's core nature is altered, it was not reached in just three months, particularly in light of the fact that the motel would again be occupied by visitors in the near future. Moreover, unlike the circumstance in *Jackson*, our interpretation of "dwelling" in § 2K1.4(a)(1)(B) does not require us to find that the arson posed a substantial risk of death or serious bodily injury to another.[11] Rather, the guideline may be applied either if there is a risk of serious injury *or* if the arson involved the destruction of a dwelling. Accordingly, the district court

---

[11] In *Jackson,* the court observed that "the idea that 'whenever a private residence is broken into, there is always a substantial risk that force will be used'" is a critical element of the conclusion that the burglary of a home is a "crime of violence" within the meaning of U.S.S.G. § 4B1.2(a)(2). *Jackson*, 22 F.3d at 585 (quoting *United States v. Flores*, 875 F.2d 1110, 1113 (5th Cir.1989)).

did not err in concluding that the motel was a dwelling within the meaning of § 2K1.4(a)-(1)(B).

## V.

Smith contends her sentence violates the double jeopardy clause of the Fifth Amendment. This is a question of law, so we review it *de novo*. *United States v. Kimbrough*, 69 F.3d 723, 728 (5th Cir. 1995).

When a defendant challenges multiple punishments for the same conductSSrather than multiple prosecutionsSSour double jeopardy analysis turns on whether Congress has authorized the result at issue. If Congress has enacted statutes that separately punish the same conduct, there is no double jeopardy violation. *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983); *United States v. Prestenbach*, 230 F.3d 780, 782 n.9 (5th Cir. 2000). Where that inquiry proves inconclusive, we disregard intent and determine "whether conviction under each statutory provision requires proof of an additional fact which the other does not." *United States v. Corona*, 108 F.3d 565, 572 (5th Cir. 1997) (quoting *United States v. Nguyen*, 28 F.3d 477, 482 (5th Cir.1994)). Where punishment is assessed under three or more statutory provisions, each offense must require proof of a fact that is not part of the sum of the elements necessary to prove the other two offenses. *Id.*; *see also Blockburger v. United States,* 284 U.S. 299 (1932).

Smith relies on *Corona* to challenge her concurrent sentences for (1) arson under 18 U.S.C. § 844(i); (2) conspiracy to commit arson and mail fraud under 18 U.S.C. § 371; and (3) use of fire to commit a felony under 18 U.S.C. § 844(h)(1). In *Corona*, 108 F.3d at 573, we held that the Double Jeopardy Clause was violated by a sentence issued under the

7

same three statutes where the predicate felony in the use of fire count is a conspiracy to commit arson. Citing *Blockburger*, we observed that "[o]nce the jury has found the defendants guilty of arson and conspiracy to commit arson, it has found them guilty of using fire as part of that conspiracy." *Id.*

The government's first response, that *Corona* was "limited . . . to its particular facts" by a subsequent panel, is totally meritless. Just as no subsequent panel of this court is free, absent intervening Supreme Court decisions, to overrule the decisions of another panel, no panel is empowered to hold that a prior decision applies only on the limited facts set forth in that opinion. Moreover, the case cited by the government, *United States v. Nguyen*, 117 F.3d 796, 797 n.1 (5th Cir. 1997) (per curiam), does not purport to do anything more than distinguish *Corona* in a case arising out of different statutes. We are unable to do the same, because *Corona* and the present dispute arise under 18 U.S.C. §§ 371, 844(h)(1), and 844(i).

Nevertheless, even under the *Blockburger* analysis employed in *Corona*, there is no double jeopardy violation here. The critical difference between this case and *Corona* is that the superseding indictment charged this defendant with the use of fire to commit mail fraud under 18 U.S.C. § 1341 and use of fire in furtherance of the conspiracy to commit arson and mail fraud under § 371. This cures the double jeopardy problem found in *Corona*, because it requires the government to prove an additional fact, in the use-of-fire count, that is not an essential element of either the arson or the conspiracy.

We agree with our sister circuits that it does not violate double jeopardy to convict of both arson and the use of fire to commit mail fraud.[12] Each of these offenses contains a unique fact not required by the other offense: Arson requires the attempted destruction of a building, and the use of fire to commit a felony violation of § 1341 requires the use of the mails to defraud another. Thus, the common requirement that fire be used for the § 844-(h)(1) use-of-fire count and the § 844(i) arson count does not constitute double jeopardy.

From this, it also follows that the double jeopardy clause is not violated by Smith's sentence, because each statute requires proof of an element not found in the others. Arson, under § 844(i), requires the use of fire *to destroy a building*. Conspiracy to commit arson under § 371 requires an *agreement* to use fire to destroy a building. And, finally, the use of fire to commit mail fraud under §§ 844(h)(1) and 1341 requires the use of fire *to defraud someone through the mails*. Because the § 1341 mail fraud charge can be satisfied with or without the use of fire, and it requires proof of facts not required by the other statutes, it does not violate double jeopardy to punish for arson, conspiring to commit arson, and using fire to commit mail fraud.

The only remaining consideration is whether our conclusion is affected by the fact that count 4 of the indictment alleges the use of fire to commit mail fraud *and* conspiracy because, under *Corona*, arguably it would violate double jeopardy to punish the defendant for the use of fire in connection with the con-

---

[12] *See United States v. Zendeli*, 180 F.3d 879, 886 (7th Cir. 1999); *United States v. Fiore*, 821 F.2d 127, 130-31 (2d Cir. 1987).

spiracy.[13] The government's decisions on how to charge do not taint do not taint the overall analysis here, however, because the jury found that Smith committed both underlying felonies, and the burning of the motel was central to the government's arguments for each. Count 1 lists the burning of the motel as one of the overt acts of the conspiracy, and count 3 lists the arson as part of the scheme to create a false insurance claim. As a result, the use-of-fire count is adequately supported by the felony of mail fraud, even if not by the conspiracy.[14]

AFFIRMED.

---

[13] We say "arguably" only because the government made the issue even more complicated by charging that fire was used to commit a "conspiracy to commit mail fraud and arson," and *Corona* does not prohibit a conviction on the use of fire to commit a mail fraud conspiracy.

[14] We note, however, that the government took an unnecessary risk in combining the conspiracies into a single count, because there was the possibility that even a technical acquittal on the mail fraud count would leave it unable to proceed on the use-of-fire count, and we would be unable to determine whether the jury found fire was used in a conspiracy to commit mail fraud or, instead, in a conspiracy to commit arson.