JERRY E. SMITH, Circuit Judge,
with whom DeMOSS, Circuit Judge, joins, dissenting:
This is a case of a prosecution run amok. Mike Nifong, another prosecutor apparently familiar with the “win at any cost” mantra,[1] most surely would approve. The government set out to “get” Humberto Cuellar for something, and why not? He is apparently a “bad dude,” an accessory to what likely was a serious drug-running operation; moreover, this is, after all, the “war on drugs.” But instead of charging under a statute of which Cuellar (by his *296 attorney’s admission) is guilty, the government used the wrong law, and the majority now has blessed the government’s missteps with a holding that makes “money laundering” out of virtually any transfer of illicit proceeds across an international border. A person steals petty cash, hides it in his shoe, and is caught crossing into Mexico: “money laundering,” according to the en banc majority’s rendering of this appeal.
The government is guilty of at least three excesses in this case. First, it stumbled by charging the wrong statute, when it easily could have used the correct one. Then, in a transparent effort to cover for its blunder, it has succeeded in making a mockery of the concept of money laundering in this court. And finally, it blatantly deprived Cuellar of his rights at trial by its knowing failure to provide adequate disclosure of the expected testimony of a key, expert witness.
Today’s zealous en banc majority aids and abets the government’s excesses. It exhibits an impressive determination to aid the “war on drugs” and the government’s boundless quest to incarcerate a foot soldier who apparently is on the wrong side of that war. Unfortunately, to achieve its end the majority ignores common sense, context, and accepted principles of statutory interpretation to reach an ultimately absurd and embarrassing result. Because I decline to rewrite the law judicially, I respectfully dissent.
I.
The relevant statute, 18 U.S.C. § 1956, bans, inter alia, a transportation of money that a defendant knows is designed “to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.” 18 U.S.C. § 1956(a)(2)(B)(l). The majority finds that because Cuellar temporarily hid the money to transport it, his behavior is within the plain meaning of the words “conceal” and “location.”
If “conceal” and “location” are considered in isolation, the majority’s reading might be plausible. But these terms are not supposed to be considered in isolation, and we must follow the Supreme Court’s guidance:
The definition of words in isolation, however, is not necessarily controlling in statutory construction. A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of a statute, and consulting any precedents or authorities that inform the analysis.
Dolan v. United States Postal Serv., 546 U.S. 481, 126 S.Ct. 1252, 1257, 163 L.Ed.2d 1079 (2006).[2] The majority must rest its interpretation on the meaning of the words in isolation, because if the context and purpose of the statute are properly considered, the majority’s interpretative error is quickly exposed.
At least two interpretations of these words are plainly apparent. There is a difference between concealing something to transport it, and transporting something *297 to conceal it. Cuellar was unquestionably doing the former: He concealed money under the floorboards of his car to transport it. Without knowing his ultimate plans for disposing of the cash once he reached his destination, however, it is uncertain whether he was also doing the latter.
For example, if Cuellar intended to place the money in a safe deposit box in another’s name, then he was transporting the money to conceal it. But if he intended to spend the money, deliver it to someone, or even donate it to charity, then he was merely concealing the money to transport it. The government did not prove or even attempt to prove anything about what Cuellar planned to do with the money once he reached his destination; the prosecution showed only that he was concealing the money to transport it.
The majority reasons that because “Congress chose the broad, unqualified word ‘conceal,’ ” the statute prohibits both transporting money to conceal it and concealing it to transport it. The majority finds that “[i]t makes no sense to say that Congress only intended to prohibit concealment that is accomplished in a certain way.” But later in the opinion the majority explicitly contradicts itself when it declares that the statutory meaning of “conceal” does not include “minimal attempts at concealment,” such as concealing money in a closed box.
This is a damaging admission, by the en banc majority, that these words cannot be interpreted in isolation. In isolation they could bear at least several meanings, from banning, as the text states, all concealment, to proscribing only those efforts at concealment that go beyond “minimal effort,” to banning concealment, that is indicative of the traditional understanding of money laundering. The majority uses the frailest of legal logic to claim that the second option is correct. An honest examination reveals how wrong that proffered logic really is.

The statute’s title

This statute’s title is “[Ijaundering of monetary instruments.” Where, as here, a statutory phrase is susceptible to multiple interpretations, “the title of a statute or section can aid in resolving an ambiguity in the legislation’s text.”[3] When used in a monetary context, to launder is to disguise illegally-obtained money by making it appear legitimate.[4] This usage of the word *298 is well accepted and has existed for over thirty-five years.[5]
The statute’s title cuts against the majority’s interpretation. Of the two interpretative possibilities — concealing money to transport it and transporting money to conceal its location' — -the latter is consistent with the definition of money laundering, which is to make dirty money difficult to trace by concealing its illegality. Legislative history
The terms of a criminal statute are to be construed according to their “ordinary and natural meaning ... as well as the overall policies and objectives of the statute.” United States v. Kay, 359 F.3d 738, 742 (5th Cir.2004) (quoting United States v. Lowe, 118 F.3d 399, 402 (5th Cir.1997)). If the language can bear more than one meaning, courts can use legislative history as an interpretive aid. Id. at 743.
When viewed in its totality, this statute is designed to combat money laundering, which is the cleansing of illegal funds, and not to curb the mere transportation of concealed cash. This is reinforced, as I have said, by the statute’s title. The multiple possible interpretations warrant, however, an examination of legislative history.
This inquiry is fraught with peril, because it is seductively easy to find a small, but misrepresentative, piece of legislative history that appears to support a given position.[6] Caution is thus required.[7] But even when viewed with great care, the legislative history makes it obvious that Congress passed this statute to combat traditional money laundering. Absent is any support whatsoever for the majority’s interpretation.
The government’s response to money laundering activity began with the passage of the Bank Secrecy Act in 1970.[8] That law, however, did not reach much of the money laundering that was occurring. Thus, in 1984 the President’s Commission on Organized Crime released a report detailing the problem presented by money laundering and recommending the legislative solution that eventually became the law at issue in this case, § 1956.
The executive report defines money laundering as “the process by which one conceals the existence, illegal source, or illegal application of income, and then disguises that income to make it appear legitimate.” PRESIDENT’S Comm’n, supra, at 7. The term is “derived from the argot of criminals, who refer to ‘dirty’ or ‘black’ cash being ‘washed’ so that it can be used openly.” Id. at 84 n. 4. The report provided several examples of the money laundering behavior that should be targeted by legislation; payments to the Gambino fam *299 ily that were transferred through three bank accounts, including one in Switzerland, then withdrawn and placed into a safe deposit box; secretion into Swiss bank accounts, by the head of the New Orleans family of La Cosa Nostra, of $1.8 million that had been extorted from the Teamsters; a drug trafficker’s practice of making numerous small deposits, totaling over $500,000, into a casino account, gambling a small amount, and then withdrawing the balance from the account in the form of checks made out to third parties, which were deposited in a securities firm before withdrawal; and the Hell’s Angels’ use of drug proceeds to purchase, through front men, failing businesses and real estate to legitimize the cash. Id. at 10-11. Each of these examples is consistent with a legislative desire to combat not the mere transportation of hidden cash, but the cleansing of illegitimate cash to make it appear legitimate.
The same intent is apparent in the legislative history once Congress began, based on the President’s recommendations, to craft the money laundering bill. The committee report states that Congress aimed the legislation at “complex schemes to disguise the illegal nature and true source” of the proceeds of their illegal activity. United States v. Butler, 211 F.3d 826, 829 (4th Cir.2000) (quoting S.Rep. No. 99-433, at 2 (1986)). Many of our sister circuits agree; as one summarized, “The legislative history indicates that Congress passed the money laundering statutes to criminalize the means criminals use to cleanse their ill-gotten gains’’[9]
This intent is also plainly evinced by the floor statements of the bill’s sponsors. Senator Thurmond, then Chairman of the Judiciary Committee, said that “[c]reation of a money laundering offense is imperative if our law enforcement agencies are to be effective against the organized criminal groups which reap profits from unlawful activity by camouflaging the proceeds through elaborate laundering schemes.” See 132 Cong. Rec. 17,571 (1986). Senator Biden remarked that “[mjoney laundering is the process by which the proceeds of crime are disguised to appear legitimate .... Or as a former money launderer stated, ‘Laundering money is to switch the black money or the dirty money to clean money.’ ” Id. Senator DeConcini declared that “[wjithout the means to launder money, thereby making cash generated by a criminal enterprise appear to come from a legitimate source, organized crime could not flourish as it now does.” Id. at 18,487. Finally, Senator Hatch defined the target of the bill as “the process by which one conceals the existence, illegal source, or illegal application of income and camouflages the source of that income to make it appear legitimate.” Id.
The final piece of legislative history evincing the intent of Congress can be found by examining a subsequent law, 31 U.S.C. § 5332, which prohibits bulk cash smuggling. See Pub.L. No. 107-56, § 371(c), 115 Stat. 337 (2001). It was enacted in 2001 because Congress realized *300 that § 1956 did not prohibit the carrying of bulk cash across a U.S. border.[10] Or, as the Committee put it, “under current law, the person transporting currency may not be guilty of any money laundering offense.” See H.R. Rep. 107-250®, at 37. The law was passed with a finding that “[t]he arrest and prosecution of bulk cash smugglers are important parts of law enforcement’s effort to stop the laundering of criminal proceeds, but the couriers who attempt to smuggle the cash out of the United States are typically low-level employees of large criminal organizations ....” Pub.L. No. 107-56 § 371(a)(5). The conclusion is inescapable — Congress enacted § 5832 because bulk cash smuggling by low-level drug couriers is not proscribed by § 1956.
Thus, the history underlying the enactment of § 5332 is especially damning to the position taken today by the en banc majority. Congress would not have passed a statute banning bulk cash smuggling by low-level drug couriers if such behavior was already prohibited as money laundering. Maybe because it would doom its desired conclusion, the majority conveniently opts not to address this issue. It ignores all the legislative history, hiding instead behind the facade that the plain language of the statute compels its conclusion.
Further, none of the pitfalls that occasionally plague an inquiry into legislative history is present here. It is overwhelmingly evident from the executive report, committee reports, sponsor statements, and subsequent legislation that Congress intended the money laundering statutes to target the cleansing of illegally obtained money. In support of the en banc majority’s novel interpretation, however, the government can muster only one snippet of legislative history from § 1956 — a single sentence from a floor statement that, when considered fairly and in context, actually cuts against the majority’s interpretation.[11] In contrast, Cuellar cites thirty-eight pieces of legislative history in consistent support of the correct interpretation.

The rule of lenity

The rule of lenity is nearly as old as statutory interpretation itself. See United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 79, 5 L.Ed. 37 (1820). That rule dictates that ambiguous statutory language in criminal statutes should be strictly construed to ensure that we do not penalize conduct that Congress did'not intend to criminalize. See, e.g., United States v. Elrawy, 448 F.3d 309, 316 (5th Cir.2006). It is an “outgrowth of our reluctance to increase or multiply punishments absent a clear and definite legislative directive.” Id. (quoting Simpson v. United States, 435 U.S. 6, 15-16, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978)). The rule of lenity is triggered if the interpretive issue is subject to “some doubt,” and the doubt must be “resolved in favor of the defendant.” Adamo Wrecking Co. v. United States, 434 U.S. 275, 284-85, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978) (citing United States v. Bass, 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)).
The rule of lenity cuts against the majority’s interpretation. The majority re *301 solves the statute’s ambiguity in a -manner that exposes Cuellar to a punishment of twenty years’ imprisonment and a fine of up to $500,000. A strict construction of the statute, as required by the rule of lenity, would find that conviction requires proof that the money is being transported to conceal its location, a burden the government utterly failed to meet.

The Canon Against Absurdities

It is well established' that reviewing courts must avoid interpretations that produce absurd results.[12] This maxim also dictates' that if a statute’s language appears plain but leads to absurd results, the court should examine extrinsic interpretive aids.[13]
Two examples illustrate the absurdity of the majority’s interpretation. First, imagine a young petty thief who pickpockets a small sum of cash from an unsuspecting Laredo tourist and intends to spend it on an enjoyable evening at the bars of Nuevo Laredo, just across the Mexican borden Wanting to escape suspicion at the border, the youth conceals the cash in his shoe. But alas, his nervous demeanor prompts border agents to question him further, and he reveals his crime. Under today’s holding, this minor miscreant is now guilty of money laundering and faces up to 20 years’ imprisonment and a fine of $500,000.
Our hypothetical international money-laundering youth satisfies all five prongs of the statute: (1) He attempted to transport funds across a U.S. border; (2) the funds were the proceeds of illegal activity; (3) he knew the funds were illegal; (4) the method of transportation was designed to conceal the location of the funds by hiding it from law enforcement; and (5) the accused knew that the concealment was part of the transportation plan. The fourth prong is satisfied because, under today’s en banc decision, the concealment prong of the money laundering statute requires only that a defendant temporarily hide money for the purpose of transporting it. This is because, as the majority lamely explains, “Congress chose the broad, unqualified word ‘conceal.’ It makes no sense to say that Congress only intended to prohibit concealment that is accomplished in a certain way.”
This is an embarrassing and absurd result and thus cannot be the correct meaning of the statute, yet it is the conclusion of today’s majority and is now the law in this circuit. At oral argument the government claimed that the hypothetical pickpocket would not be guilty of money laundering because hiding money in one’s shoe is not concealment, but instead is only “mere concealment,” whereas hiding money in a hidden compartment covered with goat hair is concealment. When pressed, the government attorney stated-,. “I don’t think that just concealing money is what Congress was talking about.”
*302 Today’s majority makes a similarly irrational distinction — between concealment and “mere concealment” — -when it distinguishes United States v. Dimeck, 24 F.3d 1239 (10th Cir.1994). In that case the defendant hid cash in a box. The majority claims this was insufficient to satisfy the concealment prong of the statute, because it was “a minimal attempt at concealment.”
Here the majority’s zealous reasoning completely unravels. Its argument is purportedly premised on the plain words of the statute, so it refuses to consider the interpretive tools used above, because it maintains that the text is not susceptible to multiple interpretations: The majority reasons that “to conceal” is to hide something,[14] and Cuellar hid money while he was transporting it, so his transportation was designed to conceal and satisfies the statute.
But, when confronted with Dimeck, or presumably with the hypothetical above, the majority says that it is only a “minimal attempt” at concealment, or as the government says, “mere concealment” or “normal concealment,” and accordingly is not concealment under the statute. Thus, the majority goes beyond the plain meaning and finds that when Congress said “conceal,” it actually meant “tried really hard to conceal” or “concealed really well.” This majority, as only a majority can, is having its cake and eating it too: It refuses to examine tools of statutory interpretation on the excuse that it must stop at the plain meaning, but it distinguishes unfavorable precedents and hypotheticals by going beyond the plain meaning.
The absurdity of the result reached by the majority is starkly illustrated by still another hypothetical. Cuellar would not be found guilty of violating this statute under today’s ruling if he had set the cash, bundled and smelling of marihuana, in a large pile in the passenger seat of his car. Under such a circumstance, he would have made no attempt to hide the money, so his behavior would fall outside the reach of the majority’s ruling. One lesson pickpockets and petty criminals near a U.S. border should take from today’s ruling is to carry the proceeds of their illegal activity openly and conspicuously when crossing the border, because if they hide the money they place themselves at risk of a conviction for money laundering, with its stiffer penalties. Although that might be a rational legislative goal, it is not encompassed within a fair reading of § 1956.
The majority does not even pretend that Congress could have intended these results. In fact, the majority does not address these hypotheticals or any other consequences of its ruling. Instead, its ipse dixit opinion focuses exclusively on ensuring that Cuellar’s conviction is upheld by any means acceptable to a majority of the en banc judges.

Caselaw

The cases cited by the majority, when reviewed carefully, provide no support for its view. The majority leads with United States v. Ness, 466 F.3d 79 (2d Cir.2006), in which the defendant moved narcotics proceeds abroad at the behest of drug traffickers. He transferred millions of dollars in cash from the United States to Belgium, Canada, and Israel by employing a sophisticated network of couriers who used code words and clandestine meetings to smuggle the funds. United States v. *303 Ness, 2003 WL 21804973, at *l-*4 (S.D.N.Y. Aug.6, 2003). Ness does not, as the majority claims, indicate that the position of the Second Circuit aligns with the position the majority adopts today. The Ness court explicitly premises its holding on the complexity of the scheme: “[W]e express no view as to sufficiency issues that might arise when the remittance of unlawful funds is surrounded by less elaborate stratagems or a lesser measure of secrecy.” Ness, 466 F.3d at 81. The scrupulous avoidance of a paper trail and the use of numerous couriers, small bills, clandestine meetings to funnel millions of dollars in drug proceeds overseas is classic money laundering, and it could not be more distinguishable from Cuellar’s use of duct tape and goat hair to conceal money temporarily while he transported it. The majority next relies on United States v. Short, 181 F.3d 620 (5th Cir.1999) (Davis, J.), in which defendant was convicted of money laundering because he gave his wife $25,000 and asked her to place it in a safe deposit box rented in the name of one of her relatives. The majority claims that “nothing happened to the cash except the defendant removed it from his possession and tried to hide it.” The majority errs: Something did happen to the cash — Short passed it to someone else with directions to place it in a secure location under the name of an innocent relative. This is classic money laundering — the transfer of dirty money through legitimate individuals to disguise its criminal source.
This court did not hold in Short, as today’s majority appears to claim, that Short’s conduct was sufficient to justify the conviction merely because he tried to hide the cash. Rather, the panel based its holding on the manner by which Short did so, particularly his planned' transfer of the cash through others. The court held that the conviction was justified because “Short was attempting to conceal or disguise [the cash] by having his wife place the money in a safety deposit box under the name of one of her relatives.” Id. at 626. By placing the money under the name of someone not connected directly to Short, but only to his wife, he was trying to make the cash appear legitimate.
In contrast to Short, Cuellar merely hid cash to transport it. He did not attempt to conceal the fact that the cash was drug money; to the contrary, as Agent Nuckles testified, Cuellar’s transportation method typified that of a drug courier. Nor did Cuellar attempt to transfer the cash through legitimate persons, as did Short, to make it appear legal. These distinctions place Cuellar’s conduct outside the holding of Short, under which the evidence against Cuellar is insufficient to sustain a conviction under the statute the government charged.
The majority next cites United States v. Cihak, 137 F.3d 252 (5th Cir.1998), which is just as distinguishable. Cihak received approximately $2 million in illegal kickbacks funneled through his attorney in an elaborate eight-step scheme to mask the nature and source of the funds.[15] Follow *304 ing a codefendant’s conviction, Cihak transferred $860,000 to multiple foreign accounts in different countries. Id. at 262. The money was first transferred to two accounts in Texas before being sent to accounts in Panama and Mexico. Id. As was the case in Ness and Short, this is classic money laundering: The defendant split his illegally gained money into smaller amounts, transferred these amounts multiple times through different banks, and ultimately placed them into offshore accounts. It is amazing that the majority finds this precedent, involving sophisticated white-collar money laundering, applicable to Cuellar’s use of duct tape and goat hair to hide money covered in marihuana. It should be obvious that Cihak’s behavior typified money laundering, as targeted by § 1956, and that Cuellar’s did not.
The only other published case cited by the majority is United States v. Carr, 25 F.3d 1194 (3d Cir.1994), in which defendant made numerous trips to the Cayman Islands and Colombia to deposit quantities of bills of small denominations that had been exchanged for large quantities of fresh $100 bills. Id. at 1199-1200. Once again, note the facts omitted by the majority, which show that Carr was participating in classic money laundering: the exchange of large bills for smaller ones and the making of multiple cash deposits into offshore banks accounts.
The majority repeats the same drill four times — it cites cases, carefully removes all context, and ignores the inconvenient details that distinguish those cases from Cu-ellar’s conduct. All four decisions stand squarely for the proposition that § 1956 bans only the transportation of money to conceal it, not the concealment of money to transport it. Further, in citing only these four inapposite decisions, the majority ignores the overwhelming caselaw, in both this court and our sister circuits, to the effect that the statute requires a design to create the appearance of legitimate wealth.[16] It is astounding that the majori *305 ty rewrites the law in this circuit, and creates a circuit split, in such a cavalier and intellectually imprecise manner.
Finally, in addition to arguing that Cuel-lar concealed the money, the majority holds that the evidence can bear a jury finding that Cuellar’s transportation method concealed the “nature of the cash as drug proceeds.” But Cuellar did precisely the opposite: He transported the cash in a manner that made it obvious that this was drug money; the sum of $83,000 in cash smelling of marihuana was bundled, wrapped in duct tape, and covered with plastic bags, then placed in a hidden compartment and covered with carpet and goat hair. These measures would not persuade anyone that this cash was legitimate.
Quite the opposite — it is difficult to imagine what more could be done to indicate that this cash was illicit. In addition to comporting with common sense, this conclusion is verified by Agent Nuckles’s testimony that this was a “usual method” of transporting drug money. The majority is incorrect: This method of transportation made it abundantly obvious that the cash was drug money.
In sum, the majority finds a way to ensure that Cuellar goes to prison, thereby protecting the Executive Branch’s prosecution despite its having charged entirely the wrong statute. Unfortunately, that now-successful effort requires ignoring the statute’s context, its title, the legislative history, the rule of lenity, the canon against absurdities, and existing caselaw. I can find no basis for the majority’s holding other than the personal legislative preferences of its members.
II.
The majority also holds that the district court acted permissibly in not imposing sanctions on the government for violating Federal Rule of Criminal Procedure 16. This is error.
As it does with accepted principles of statutory interpretation, the en banc majority completely ignores the framework used by this court in evaluating whether to impose sanctions for a violation of rule 16. In United States v. Sarcinelli, 667 F.2d 5, 6-7 (6th Cir. Unit B 1982), we articulated a four-factor test to determine a proper sanction: (1) the reasons why disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of the trial; and (4) any other relevant circumstances.[17]
A brief recounting of facts omitted by the majority is needed before embarking on the analysis. Cuellar requested a summary of the government’s expert witnesses that described the “witness’s opinions, the bases and reasons for those opinions, and the witness’s qualifications.” Fed. R.CRim. P. 16(a)(1)(G). The court’s discovery order required a response by a specified date. Almost three weeks after that deadline, and only two weeks before trial, the gov- *306 eminent stated, in a letter, that Nuckles would testify
concerning the organizational structure of a typical drug smuggling operation, including, but not limited to, how drug proceeds are packaged, hidden and transported; routes of travel; time of day; types and conditions of vehicles; documents kept by transporters in their vehicles or on their persons; manner in which drugs are smuggled into the United States and money is smuggled out of the United States; and any other testimony that may help the jury understand this case.
The government provided no further details on the specifics of the testimony or on Nuckles’s qualifications until it gave Cuel-lar a handwritten note in response to his motion to deny the expert testimony. The note, in its entirety, read, “Rick Nuckles = 12 years U.S. Customs; 4 years DEA; 7 years state + local, UCw/ DEA, 100’s of drug cases investigated in all capacities.” The court denied Cuellar’s motion, noting its familiarity with Nuckles based on its admission of him as an expert on at least one occasion.
Instead of using the Sarcinelli framework, which it mentions in a footnote, the en banc majority creates a new test. It first finds that the government did violate rule 16, then it notes that “[t]he type of expert testimony offered by Officer Nuck-les has become almost routine.”[18] Finally comes the new test: The refusal to impose sanctions on the government was not improper after all, according to the majority’s notion, because Cuellar effectively cross-examined Nuckles, so Cuellar’s substantial rights were not prejudiced.
The two cases cited by the majority for its new test provide no support. In United States v. Doucette, 979 F.2d 1042 (5th Cir.1992), the disputed evidence was made available to defendant well before trial, and defense counsel did not avail himself of the opportunity to review it. “For this reason, there can be no violation of Rule 16 where, as here, the defendant’s lack of diligence is the sole cause of his failure to obtain evidence made available by the government.” Id. at 1045. This holding has no bearing on the present case, where the government, in blatant and intentional violation of rule 16, provided no timely opportunity for Cuellar to review fully the expected testimony of Nuckles.
The other cited authority is United States v. Smith, 354 F.3d 390 (5th Cir.2003), which dealt with whether one sentence of the expert’s testimony was beyond his expertise and exceeded the disclosure that was made in accordance with rule 16. This is plainly much different from the case before us, where (as the en banc majority admits) the government has violated rule 16.
Doucette and Smith thus do not form a reasonable basis for the majority’s new test. Today’s majority opinion creates one “super factor” that supplants the entire Sarcinelli framework: If the defendant effectively cross-examines an expert witness, any violation of rule 16 by the government in failing to disclose that witness’s testimony is overlooked.
I wonder whether the majority has considered the risky game today’s opinion creates for criminal defendants when the government violates rule 16. Defendants whose counsel “burn the midnight oil” to cobble together a cross-examination strategy that, while less effective than one that could have been prepared had the government followed rule 16, still manages to be semi-effective, now face the prospect of losing the remedy for the rule 16 violation. *307 On the other hand, the defendant whose attorney does nothing and mounts an ineffective cross-examination risks harming his chances at trial but stands a better chance of an appellate court’s finding that a remedy is needed for the rule 16 violation. These perverse incentives provide further reason for this court to hew to the Sarcinelli test.
Had the court applied Sarcinelli, and had it done so properly, it would have found the following: Under the first factor, the government makes no attempt to explain its failure to adhere to the discovery order. Under the second, Cuellar was caused substantial prejudice by the government’s three-week head start in the preparation of Nuckles, while Cuellar had two weeks to prepare and little detail about the content of Nuckles’s testimony. Third, the district court likely could have cured the prejudice by granting, as Cuellar requested, a continuance so he could prepare more fully.
Finally, other factors may come into play. It is here that the majority should have considered the factor it has chosen to make dispositive, that despite the violation of rule 16, Cuellar elicited (the seemingly self-evident) testimony from Nuckles that some “legal enterprises could have a need to transport United States currency to Mexico.” This is less than eviscerating cross-examination testimony, but according to today’s majority, it is sufficient to excuse the government’s rule 16 violation.
In. sum, the government completely flouted the discovery rules to Cuellar’s detriment but offered no explanation for its action. The majority finds that, because Cuellar elicited self-evident testimony on cross-examination, he had-sufficient time to prepare, so no sanction is necessary. This holding creates perverse incentives: incentives for the government to ignore well-established' discovery rules because it need not fear sanctions, and incentives for the defendant to hold back from . mounting an effective defense so he might have a chance to have the government sanctioned on appeal.
III.
In summary, Humberto Cuellar likely committed a serious violation of the United States Code, but not of the section of which he was convicted. Justice requires that he be tried for a crime of which a reasonable prosecutor can believe he is actually guilty. The war on drugs is not an excuse to violate the norms of fair play and evenhandedness. I call upon the Attorney General to confess error in this case of prosecutorial excess, and I respectfully dissent from the majority’s blessing of the government’s failure to do justice in this case.

. See, e.g., Dorothy Rabinowitz, The Michael Nifong Scandal, Wall St. J., Jan. 11, 2007, at A15, available at http://www.opinionjoumal. com/medialog/?id= 110009507; Editorial, As Duke Case Unravels, Focus Turns to Prosecutor, USA Today, Dec. 27, 2006, at A12, 2006 WLNR 22559516.

. The Dolan Court found that, based on context and precedent, the term “negligent transmission” had a statutory meaning that was more narrow than its ordinary meaning and usage. The majority opinion was joined by Justice Scalia, one of the judiciary’s foremost textualists. See also United States v. Lowe, 118 F.3d 399, 402 (5th Cir.1997) (”[T]he plain meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.” (citing Reich v. Arcadian Corp., 110 F.3d 1192, 1195-96 (5th Cir.1997))).

. INS v. Nat’l Ctr. for Immigrants’ Rights, Inc., 502 U.S. 183, 189, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). See also, e.g., Carter v. United States, 530 U.S. 255, 267, 120 S.Ct 2159, 147 L.Ed.2d 203 (2000); Almendarez-Torres v. United States, 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); FTC v. Mandel Bros., Inc., 359 U.S. 385, 388-89, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); United States v. Katz, 271 U.S. 354, 357, 46 S.Ct. 513, 70 L.Ed. 986 (1926); Smythe v. Fiske, 23 Wall. 374, 90 U.S. 374, 380, 23 L.Ed. 47 (1874); Denn v. Reid, 35 U.S. 524, 527, 10 Pet. 524, 9 L.Ed. 519 (1836).

. See, e.g., President’s Comm'n on Organized Crime, The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering 7 (Books for Bus. 2001)(1985) (defining money laundering as "[t]he process by which one conceals the existence, illegal source, or illegal application of income, and then disguises that income to make it appear legitimate”); Black's Law Dictionary 1027 (8th ed.2004) (stating that money laundering is "the act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced”); 8 Oxford English Dictionary 702 (2d ed.1989) (explaining that to launder is “to transfer funds of dubious or illegal origin, usually to a foreign country, and then later to recover them from what seem to be 'clean' sources”); The American Heritage Dictionary of the English Language 992 (4th ed. Houghton Mifflin Co. 2006) (showing that to launder is "to disguise the source or nature of (illegal funds, for example) by channeling through an intermediate *298 agent”); The New Oxford American Dictionary 958 (2d ed. Oxford Univ. Press 2005) (stating that to launder is to "conceal the origins of (money obtained illegally) by transfers involving foreign banks or legitimate businesses”).

. The Barnhard Dictionary of Etymology 581 (Robert K. Barnhard ed., H.W. Wilson Co.1988) ("The modern meaning of launder, as used to denote the 'cleansing' of illegally obtained 'dirty' money to make it appear 'legitimate, lawfully gained, or acceptable,’ originated in 1970.”).

. As Judge Leventhal warned, using legislative history is sometimes akin to "looking over a crowd and picking out your friends.” See Patricia M. Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 214 (1983).

. See Aviall Servs., Inc. v. Cooper Indus., Inc., 312 F.3d 677, 683-84 (5th Cir.2002) (citing Boureslan v. Aramco, 857 F.2d 1014, 1018 (5th Cir.1988), adopted en banc, 892 F.2d 1271 (5th Cir.1990), aff'd sub nom. EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)).

. See Pub.L. 91-508, 84 Stat. 1118, § 221(a)(2), as amended, 31 U.S.C. § 5313(a).

. United States v. Savage, 67 F.3d 1435, 1441 (9th Cir.1995) (emphasis added). See also United States v. Edgmon, 952 F.2d 1206, 1213 (10th Cir.1991) (citing S.Rep. No. 99-433, at 4); United States v. Estacio, 64 F.3d 477, 481 (9th Cir.1995) ("The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity.”); United States v. Holmes, 44 F.3d 1150, 1154 (2d Cir.1995) ("Creation of a money laundering offense is imperative if our law enforcement agencies are to be effective against the organized criminal groups which reap profits from unlawful activity by camouflaging the proceeds through elaborate laundering schemes.”) (quoting S.Rep. No. 99-433, at 9).

. The astute reader may ask why Cuellar was not convicted under this statute. It is because the government did not charge him with it, but opted instead to charge money laundering, which carries a maximum prison term of twenty years, compared to a maximum of five for bulk cash smuggling. Cuellar concedes on appeal that he violated § 5332.

. The majority cites a statement from Senator Biden that money laundering is used by drug traffickers to convert illegal cash into manageable form. This quote came two sentences after Senator Biden had defined money laundering as "the process by which the proceeds of crime are disguised to appear legitimate.” 132 Cong. Rec. 17,571 (1986).

. Rowland v. Cal. Men’s Colony, 506 U.S. 194, 200, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993); EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 120, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); Carpenters Dist. Council v. Dillard Dep't Stores, 15 F.3d 1275, 1285 (5th Cir.1994) (citing Birdwell v. Skeen, 983 F.2d 1332, 1337 (5th Cir.1993)).

. Clinton v. City of New York, 524 U.S. 417, 429, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998); United States v. X-Citement Video, Inc., 513 U.S. 64, 69, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); Burns v. United States, 501 U.S. 129, 135, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991); Pub. Citizen v. U.S. Dep’t of Justice, 491 U.S. 440, 454-55, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); Green v. Bock Laundry Mach. Co., 490 U.S. 504, 509, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989); Am. Trucking Ass’ns, Inc. v. ICC, 659 F.2d 452, 459 (Former 5th Cir. Oct. 1981) (citing United States v. Am. Trucking Ass’ns, 310 U.S. 534, 543-44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)).

. Conceal means “to put, remove, or keep out of sight or notice; to hide.” 3 Oxford English Dictionary 646 (2d ed.1989). See also Webster's New International Dictionary 551 (2d ed. 1958) ("To hide or withdraw from observation; to cover or keep from sight; to prevent the discovery of”); Webster's Ninth New Collegiate Dictionary 271 (1984) ("to prevent disclosure or recognition of; to place out of sight”).

. The opinion described the laundering scheme by which defendant Bloch would provide kickbacks to Cihak:
(1) First City paid Banner [Bloch's company] for Bloch’s consulting services; (2) Bloch deposited the checks from First City into Banner’s account; (3) the funds were then wired to another Banner account; (4) from this account, Bloch drew checks payable to himself; (5) these checks were deposited into his personal account; (6) checks made payable to Landan [Cihak’s attorney] were then drawn on this account; (7) these checks were deposited into Lan-dan’s firm's account; (8) from this account, Landan issued checks payable to various banks as payment on Cihak’s outstanding debts and to make investments for Cihak.
*304 Cihak, 137 F.3d at 257.

. See, e.g. United States v. Dobbs, 63 F.3d 391, 397 (5th Cir.1995) ("It is necessary to show a desire to create the appearance of legitimate wealth or otherwise to conceal the nature of funds so that it might enter the economy as legitimate funds.”); United States v. Gonzalez-Rodriguez, 966 F.2d 918, 925 (5th Cir.1992); United States v. Powers, 168 F.3d 741, 748 (5th Cir.1999) ("Under the money laundering statute, the government must ... show that the defendant desired to create the appearance of legitimate wealth or otherwise to conceal the nature of funds so that the money could enter the economy as legitimate funds.”); United States v. Olaniyi-Oke, 199 F.3d 767, 771 (5th Cir.1999) ("In one sense, the acquisition of any asset with the proceeds of illegal activity conceals those proceeds by converting them into a different and more legitimate-appearing form. But the requirement that the transaction be designed to conceal implies that more than this trivial motivation to conceal must be proved.”); Dimeck, 24 F.3d at 1246; United States v. Garcia-Emanuel, 14 F.3d 1469, 1474-77 (10th Cir.1994) ("[C]ases involving investments made with illegal proceeds are close to the core of the statute’s purpose of criminalizing changing cash into an ostensibly legitimate form, such as business profits or loans, before using those funds for personal benefit.”) (internal quotations and citations omitted); United States v. Sanders, 929 F.2d 1466, 1472 (10th Cir.1991); United States v. Stephenson, 183 F.3d 110, 121 (2d Cir.1999) ("There is no indication, therefore, that the drug proceeds were spent to create the appearance of legitimate wealth ....”) (internal quotations and citations omitted); United States v. Samour, 9 F.3d 531, 535 (6th Cir.1993); United States v. Esterman, 324 F.3d 565, 570 (7th Cir.2003) ("[T]he Money Laundering Control Act of 1986 was meant to target the transformation of funds derived from illegal activities into a 'clean' or useable form.”); United States v. Jackson, 935 F.2d 832, 841-42 (7th Cir.1991); United States v. Wynn, 61 F.3d 921, 926 (D.C.Cir.1995) (upholding a money laundering conviction because, inter alia, "the jury *305 reasonably could have inferred that Wynn knew that their money was dirty and that he knew that the two were anxious to disguise their identity as the purchasers of the merchandise and the source of the cash used to pay for it.”); United States v. Johnson, 440 F.3d 1286, 1291 (11th Cir.2006) ("Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime .... If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute.” (quoting United States v. Majors, 196 F.3d 1206, 1213 (11th Cir.1999))).

. See also United States v. Katz, 178 F.3d 368, 371 (5th Cir.1999) (citing United States v. Bentley, 875 F.2d 1114, 1118 (5th Cir.1989)).

. This section conveniently omits any discussion of the majority’s later finding that Nuck-Ies’s drug courier profiling testimony-was improper and should have been excluded.